UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

IN RE:          LANDAMERICA FINANCIAL GROUP,            Case No. 08-35994
                INC., et al.,                           Chapter 11
                              Debtors.                  Jointly Administered

_____

BRUCE H. MATSON, Trustee of the
LFG Liquidation Trust,

                    Plaintiff,

v.                                                      APN 11-03168

JANET A. ALPERT, *et al*,

                    Defendants.

_____

## MEMORANDUM OPINION

Before the Court are several separate motions[1] filed by the Defendants to dismiss this

adversary proceeding pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), as

made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b).   A

hearing on the motions was held on November 17, 2011.   At the conclusion of the hearing,

counsel for the parties requested leave to file supplemental legal memoranda, the last of which

was filed with the Court on December 15, 2011.   The Court thereupon took the motions under

advisement.   For the reasons set forth below, the Court will deny the motions in part and grant

the motions in part.

_____

[1] Defendants Chandler, Evans, Gluck, Vlahcevic and Ramos' Motion to Dismiss Plaintiff's Adversary Complaint
Pursuant to Rule 12(b)(6) [Docket No. 18]; Motion of Defendant Pamela K. Saylors to Dismiss Plaintiff's Adversary
Complaint Pursuant to Rule 12(b)(6) [Docket No. 21]; Defendant Jeffrey C. Selby's Motion to Dismiss Plaintiff's
Adversary Complaint [Docket No. 25]; Defendant Brent Allen's Motion to Dismiss Plaintiff's Adversary Complaint
Pursuant to Rule 12(b)(6) [Docket No. 29]; Defendant Stephen Connor's Motion to Dismiss [Docket No. 27];
Motion of LFG Former Independent Directors to Dismiss the Complaint [Docket No. 31].

The Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  The Court has exclusive jurisdiction over this matter under Article XV of the Joint Chapter 11 Plan of LandAmerica Financial Group and its Affiliated Debtors (the "Joint Chapter 11 Plan").

This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (C), (H), and (O), in which final orders or judgments may be entered by a bankruptcy court.  Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must take as true the factual allegations in the Trustee's complaint.  *Bass v. E. I. duPont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir. 2003).

## Statement of Facts

### The Parties

LandAmerica Financial Group ("LFG") is a corporation organized under the laws of the Commonwealth of Virginia with offices throughout the United States and in Mexico, Canada, the Caribbean, Latin America, Europe, and Asia.  LFG's primary business involved the facilitation of residential and commercial real estate sales.  LFG was the third-largest title insurance underwriter in the United States.  LFG issued title insurance policies primarily through two principal title underwriting subsidiaries, Commonwealth Land Title Insurance Company and Lawyers Title Insurance Corporation.  LFG also owned two other title insurance underwriters, Commonwealth Land Title Insurance Company of New Jersey and United Capital Title Insurance Company.

LandAmerica 1031 Exchange Services, Inc. ("LES") was a wholly-owned subsidiary of LFG organized under the laws of the State of Maryland.  LES's principal business was serving as a qualified intermediary for like-kind property exchanges consummated by taxpayers pursuant to § 1031 of the Internal Revenue Code.  LES accounted for less than one percent of the revenue of LFG and its subsidiaries.

Plaintiff Bruce H. Matson (the "LFG Trustee" or "Plaintiff") was appointed as a fiduciary responsible for implementing the provisions of the Joint Chapter 11 Plan confirmed by this Court by order entered February 16, 2010.  The Plan established a liquidating trust (the "LFG Trust"), and appointed the LFG Trustee as a fiduciary responsible for administering the LFG Trust.

Defendant Janet Alpert ("Alpert") served as a member of the LFG Board of Directors.  Alpert also served as a member of LFG's Investment Funds Committee, a committee of the LFG Board of Directors (the "Investment Funds Committee").

Defendant Gail K. Caruso ("Caruso") served as a member of the LFG Board of Directors and also served as a member of the Investment Funds Committee and the LFG Audit Committee, a committee of the LFG Board of Directors (the "Audit Committee").  On or about May 13, 2008, Caruso became Chairman of the Investment Funds Committee.

Defendant Theodore L. Chandler, Jr. ("Chandler") served as Chairman of the LFG Board of Directors, and as President and Chief Executive Officer of LFG.  Chandler also served as a member of LFG's Risk Committee, a committee of LFG management (the "Risk Committee").

Defendant Michael Dinkins ("Dinkins") served as a member of the LFG Board of Directors and as a member of the Investment Funds Committee.

Defendant Charles H. Foster, Jr. ("Foster") served as a member of the LFG Board of Directors and as a member of the Investment Funds Committee.  Foster had served formerly as Chairman of the LFG Board of Directors and Chief Executive Officer of LFG.

Defendant John P. McCann ("McCann") served as a member of the LFG Board of Directors and as a member of the Audit Committee.  McCann had served formerly as Chairman of the Investment Funds Committee until May 13, 2008.

Defendant Diane M. Neal ("Neal") served as a member of the LFG Board of Directors and as a member of the Audit Committee.

Defendant Robert F. Norfleet, Jr. ("Norfleet") served as a member of the LFG Board of Directors and as a member of the Audit Committee.

Defendant Robert T. Skunda ("Skunda") served as a member of the LFG Board of Directors and as a member of the Audit Committee.

Defendant Julius P. Smith, Jr. ("Smith") served as a member of the LFG Board of Directors and as a member of the Investment Funds Committee.

Defendant Thomas G. Snead, Jr. ("Snead") served as a member of the LFG Board of Directors and as Chairman of the Audit Committee.

Defendant Eguene P. Trani ("Trani") served as Lead Director of the LFG Board of Directors.  The duties of the LFG Lead Director included, *inter alia*, ensuring that the Board operated independently of management and that the Directors received on a timely basis the reports, background materials and resources necessary or desirable to assist them in carrying out their responsibilities.  The Lead Director was also responsible for making recommendations about the retention of consultants reporting to the entire Board.

Defendant Marshall B. Wishnack ("Wishnack") was a member of the LFG Board of Directors.

Defendant G. William Evans ("Evans") served as Executive Vice President and Chief Financial Officer of LFG and as a member of the Risk Committee. Defendant Evans also served as a member of the LES Board of Directors.

Defendant Michelle H. Gluck ("Gluck") served as Executive Vice President and Chief Legal Officer of LFG. Gluck had served as the Meeting Chair of the Risk Committee until June 2008, at which time she began serving as Chairperson of the Risk Committee.

Defendant Pamela K. Saylors ("Saylors") served as a member of the LES Board of Directors. Beginning on April 3, 2008, Saylors also served as (i) President of the Commercial Services Division of LFG, (ii) President of LES, and (iii) a member of the Risk Committee.

Defendant Jeffrey C. Selby ("Selby") served until April 3, 2008, as (i) President of LES, (ii) a member of the LES Board of Directors, and (iii) as President of the Commercial Services Division of LFG.

Defendant Christine R. Vlahcevic ("Vlahcevic") served as Senior Vice President and Corporate Controller of LFG and as a member of the Risk Committee.

Defendant Stephen Connor ("Connor") served as Senior Vice President of LFG. Connor also served as Senior Vice President of LES and as a member of the LES Board of Directors. Connor was responsible for managing the day-to-day operations of LES.

Defendant Brent Allen ("Allen") served as a Vice President and National Underwriting Counsel of LES.

Defendant Ronald B. Ramos ("Ramos") served as Senior Vice President and Treasurer of LFG and as Vice President and Treasurer of LES.

### The Business Operation of LES

LES operated as a "qualified intermediary" under § 1031 of the Internal Revenue Code ("Tax Code").  Section 1031 of the Tax Code permits a taxpayer to defer all or a portion of the gains from the disposition of business or investment property under certain circumstances.  To qualify for this tax treatment, the taxpayer must structure the transaction as an exchange of one property for another of "like kind."   LES entered into agreements with its customers (the "Exchangers") to facilitate these 1031 "like kind" exchanges ("Exchange Agreements").

Under the Exchange Agreements, the net proceeds from the sale of the taxpayer's property (the "Exchange Funds") would be transferred to LES.  LES would then maintain exclusive possession and control over the Exchange Funds and any interest earned on the Exchange Funds, until the taxpayer identified a "like kind" replacement property (the "Replacement Property").  *See Millard Refrigerated Services, Inc. v. LandAmerica 1031 Exchange Services, Inc.,* 412 B.R. 800 (E.D. Va. Bankr. 2009).  LES was required within 180 days to either use the Exchange Funds to purchase the identified Replacement Property or disburse the Exchange Funds to the taxpayer (the "Exchange Obligation").  LES's general business practice was to commingle the Exchange Funds it received from the sale of one Exchanger's property with the Exchange Funds received in connection with the 1031 transactions of other customers.  LES maintained a general multipurpose checking account at SunTrust Bank for use as its general operating account (the "Operating Account").  The commingled Exchange Funds were deposited into this Operating Account.

To maximize its revenues, LES invested the commingled Exchange Funds held in its Operating Account in a variety of short term investments, including money market mutual funds, short term bonds, certificates of deposit, floating rate notes, and auction rate securities ("ARS").

An ARS is a debt instrument with a long term nominal maturity that is structured to provide liquidity through a Dutch Auction process.[2]  Since 2002, LES invested a substantial portion of the commingled Exchange Funds deposited into its Operating Account in ARS.

The LES Business Failure

Leading up to 2008, the 1031 industry as a whole had experienced a number of scandals that caused considerable public concern about the reliability and solvency of 1031 companies. LES's marketing materials sought to capitalize on the 1031 related scandals by touting LES's solvency.  During the week of February 11, 2008, demand for ARS plummeted.  Auctions of ARS failed and the market for ARS collapsed and remained frozen (the "ARS Freeze").  As a result of the ARS Freeze, LES was unable to liquidate its ARS at any price near par value.  As of March 31, 2008, approximately $290.5 million out of a total LES commingled Exchange Fund portfolio of approximately $612 million was invested in illiquid ARS.  This caused a significant liquidity problem for LES, as LES could not access the securities necessary to meet its existing 1031 Exchange Obligations.

Notwithstanding the ARS Freeze, LES continued to accept money from new Exchange customers and continued to commingle the new Exchange Funds it received with other Exchange Funds in its portfolio in order to meet its existing 1031 Exchange Obligations.  Plaintiff alleges that LES did not revise its marketing material or its scripts for LES employees in the field working to attract new Exchangers as a result of the ARS Freeze.  Plaintiff also alleges that LES failed to segregate the new Exchange Funds or to increase oversight and control over LES personnel who interacted with customers.  LES did not commence legal action against the

---

[2]  A Dutch Auction is a type of auction whereunder the interest rate is established by an auctioneer beginning at a high asking rate, which is lowered until some participant is willing to accept the auctioneer's rate, or a pre-determined reserve rate is reached.

financial institutions that had sold the illiquid ARS to LES.  LES failed to monetize the ARS,

close its business, or file for bankruptcy.  Plaintiff alleges that the Board of Directors of LES

never considered whether LES should make any changes to the way LES conducted its business

in light of the fact that close to half of the assets in its commingled portfolio were no longer

accessible to meet its existing 1031 obligations to Exchangers.

The balance of LES's commingled Exchange Fund portfolio began to decline.  In every

month from the time of the ARS Freeze in February 2008 until LES and LFG filed for

bankruptcy in November 2008, there was a substantial monthly net outflow of commingled

customer Exchange Funds.  The balance of LES's commingled Exchange Fund portfolio stood at

approximately $1.1 billion in August 2007.  That balance fell to just above $600 million in April

2008.  The balance fell below $500 million by the end of June 2008, and was below $400 million

before September 2008.  The percentage of illiquid ARS in LES's commingled Exchange Fund

dramatically increased as the balance in the Operating Account steadily declined.  By September

2008, approximately 70% of LES's commingled Exchange Fund portfolio was invested in

illiquid ARS.  Plaintiff alleges that the steady net outflow of commingled customer Exchange

Funds meant that LES's practice of soliciting new Exchange Funds to meet existing 1031

Exchange obligations was likely to fail.

The Bankruptcy Filing

The LFG Board of Directors held a special meeting on September 26, 2008.  By that

time, the percentage of illiquid ARS that comprised LES's commingled Exchange Fund portfolio

had grown to over 80%.  The LFG Board of Directors created a Special Committee of the Board

(the "Special Committee") to explore transaction opportunities including a potential sale of LFG.

On October 16, 2008, Defendants Chandler, Evans, Gluck and Ramos met with SunTrust Bank,

8

one of LFG's primary lenders, to discuss LFG's third quarter results and the impact of these results on certain loan covenants in LFG's credit agreement with SunTrust. During the meeting, an attorney with SunTrust stated that the bank was leery of entering into any further transactions with LFG because LES's practice of using new Exchange Funds to pay its existing 1031 Exchange Obligations, at a time when most of the assets in its portfolio were illiquid, might be viewed as fraudulent.

On October 20, 2008, Chandler wrote to the United States Treasury Secretary, the Honorable Henry M. Paulson, Jr., requesting financial assistance for LFG under the Emergency Economic Stabilization Act of 2008. This request was not granted. Following a failed merger with Fidelity National Title Insurance Company, Chicago Title Insurance Company, and Fidelity National Financial, Inc. (collectively, "Fidelity"), LFG and LES filed voluntary petitions for relief in this Court under Chapter 11 of the Bankruptcy Code on November 26, 2008 (the "Petition Date").

## The Complaint

Plaintiff alleges that the LFG Board of Directors exercised no independent business judgment and failed to take or consider timely action with respect to the LES liquidity issue. The Plaintiff also alleges that the LFG Board failed to act in good faith and grossly mismanaged LFG by failing in its oversight responsibility. Plaintiff alleges that the LFG directors failed to inform themselves about the effects of the LES liquidity issue.

Plaintiff alleges that the LES Board of Directors did not hold any meetings at all in 2008. Plaintiff alleges that the LES Board of Directors exercised no independent business judgment, failed to take or consider any timely action with respect to the LES liquidity issue, and failed to exercise adequate oversight and control over LES and its officers with respect to the LES

liquidity issue.  Plaintiff alleges further that the LES directors failed to timely or adequately inform themselves about issues pertaining to the LES liquidity issue.

Plaintiff alleges that the LFG Officers breached the fiduciary duties that they owed to LFG by (i) failing to timely inform themselves about the LES liquidity issue, (ii) failing to consider any timely action to address the liquidity issue, (iii) failing to take any action to prevent or mitigate the effect of the LES liquidity issue on LFG, (iv) and failing to inform the LFG Board of Directors of crucial facts regarding the LES liquidity issue.

Plaintiff alleges that the LES Officers breached the fiduciary duties that they owed to LES and LFG by (i) failing to timely inform themselves about the LES liquidity issue, (ii) failing to consider any timely action to address the liquidity issue, (iii) failing to take any action to prevent and/or mitigate the effect of the LES liquidity issue, (iv) failing to exercise the duties they owed in good faith, in the best interest of the corporation, and with the care that an ordinary prudent person in a like position would have used under similar circumstances, and (v) failing to exercise adequate oversight and control over LES'S employees.

Plaintiff alleges that between September 25, 2008, and October 17, 2008, LFG made significant, unauthorized transfers totaling $65 million to LES.  These transfers violated the authority guidelines established by the LFG Board of Directors in 2006, which required prior review and consent by the LFG Board of Directors or the Executive Committee for such transactions exceeding $10 million.  The authority guidelines also required the Chairman of the LFG Board, the Chief Executive Officer of LFG, and the Chief Financial Officer of LFG to review and consent to such transactions between $5 million and $10 million.  Plaintiff alleges that the LFG Board of Directors and the LFG Officers failed to adhere to these corporate

requirements with respect to the unauthorized transfers totaling $65 million made by LFG to its wholly owned subsidiary, LES.

## Counts I – IV

Counts I through IV allege breach of fiduciary duty claims against all of the LFG and LES Defendants.  Count I alleges breach of fiduciary duty claims on behalf of LES and LFG against the members of LES's Board of Directors (the "LES Director Defendants").  Count II alleges breach of fiduciary duty claims on behalf of LES and LFG against the LES Officers named in the Complaint (the "LES Officer Defendants").[3]  Count III alleges breach of fiduciary duty claims on behalf of LFG against the members of LFG's Board of Directors (the "LFG Director Defendants").  Count IV alleges breach of fiduciary duty claims on behalf of LFG against the LFG Officers named in the Complaint (the "LFG Officer Defendants").[4]

## Count V

Count V alleges a claim for corporate waste against Defendants Evans and Ramos for causing the unauthorized transfers totaling $65 million to occur in violation of LFG's Authority Guidelines.

## Count VI

Count VI seeks to equitably subordinate the proofs of claim filed by the Defendants against the Estate.

---

[3]  The LES Director Defendants and the LES Officer Defendants are hereinafter referred to as the "LES Defendants."

[4]  The LFG Director Defendants and the LFG Officer Defendants are hereinafter referred to as the "LFG Defendants."

Count VII

Count VII seeks to avoid certain change of control employment agreements of some of the Defendant Officers as fraudulent conveyances.

## Rule 12(b)(6) Standard

A motion to dismiss under Rule 12(b)(6) must be assessed in light of the liberal pleading standard set forth in Rule 8 of the Federal Rule of Civil Procedure as incorporated in this adversary proceeding by Rule 7008 of the Federal Rules of Bankruptcy Procedure ("Rule 8"). Rule 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief. *iCore Networks, Inc. v. McQuade Brennan LLP,* 2009 WL 36596, at *2 (E.D. Va. January 5, 2009). Motions brought under Rule 12(b)(6) are evaluated under a "plausibility standard." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007); *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-50 (2009). The plausibility standard does not require heightened fact pleading of specifics, but only fact pleading sufficient to state a claim for relief that is plausible on its face. Under this standard, the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545. *See also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice And Procedure* § 1216, at 235-36 (3d ed. 2004) ("[T]he pleading must contain something more by way of a claim for relief than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action."). A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant may be liable for the misconduct alleged.

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint. The motion does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008); *Wu v. Tseng,* 2007 WL 2010877, at *5 (E.D. Va. January 24, 2007). The factual allegations in the plaintiff's complaint must therefore be accepted as true and must be construed in the light most favorable to the plaintiff. *Iqbal*, 129 S.Ct. at 1949. A party may set out two or more statements of a claim or defense alternatively or hypothetically, and a pleading is sufficient if any one of them is sufficient. Fed. R. Civ. P. 8(d)(2); *Lathon v. Walmart Stores, E., LP,* 2009 WL 1172864, at *2 (E.D. Va. April 29, 2009).

## Choice of Law

The claims for breach of fiduciary duty alleged in the complaint are state law claims arising out of the Defendants' service as officers and directors of LFG and LES. Under traditional conflict of laws principles, the law of the state of incorporation applies to claims that relate to the internal affairs of the corporation. *See, e.g., First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."); *Stockbridge v. Gemini Air Cargo, Inc.*, 611 S.E.2d 600, 602 (Va. 2005) (applying the law of the state of incorporation because the controversy involved the internal affairs of the corporation); *Storetrax.com, Inc. v. Gurland*, 915 A.2d 991, 1000 (Md. 2007) (stating that "the laws of the state of incorporation generally will govern matters involving the internal workings of a corporation").

As LFG is a corporation organized under the laws of the Commonwealth of Virginia, Virginia law applies to Plaintiff's claims against the LFG Defendants in their capacities as

officers and directors of LFG.  As LES is a corporation organized under the laws of the State of

Maryland, Maryland law applies to Plaintiff's claims against the LES Defendants in their

capacities as officers and directors of LES.

### The Plan

On the Petition Date, any and all legal and equitable interests belonging to LFG and LES

became property of their respective bankruptcy estates.  11 U.S.C. § 541.  Property of the

bankruptcy estates included any causes of action that LFG and LES had against the prepetition

officers and directors of LFG and LES.  Section 8.2(d) of the Joint Chapter 11 Plan confirmed by

this Court on February 16, 2010, provides that "on the effective date and in accordance with and

pursuant to the terms of the Plan, LES and LFG shall transfer, assign and deliver to the

applicable Trust, all of their rights, title and interests in all of the Trust assets, notwithstanding

any prohibition of assignability under non-bankruptcy law."  Section 1.216 of the Plan defines

Trust assets to include "LFG Trust assets and LES Trust assets."  Section 1.138 of the Plan

defines LFG Trust assets to include "other litigation," which under § 1.158 of the Plan includes

"all causes of action of LFG and/or LES against (a) prepetition officers and directors of LFG,

LES or former underwriter subsidiaries, in their capacity as such. . . ."  Therefore, any claims

that LFG and LES had against the prepetition directors and officers of LFG and LES (the "D&O

Claims"), which had become property of the bankruptcy estates on the Petition Date, were

transferred by the Joint Chapter 11 Plan to the LFG Trust, which now holds those D&O Claims.

The LFG Trustee is exclusively authorized pursuant to § 8.3 of the Plan to prosecute the "other

litigation" (which includes the D&O Claims) and to object to and/or seek to subordinate claims

against LFG.

Plaintiff emphasizes the fact that the existence of LFG was not terminated as a result of the confirmation of the Joint Chapter 11 Plan in this case.  Not all of the property of the LFG bankruptcy estate was transferred to the LFG Trust – some was intentionally left behind.  The Joint Chapter 11 Plan provides that the "post-effective-date LFG" is to be managed by a dissolution trustee.  The dissolution trustee and the post-effective-date LFG are entities separate and apart from the LFG Trust.[5]  The LFG Trustee is not the successor in interest to LFG, but rather is the fiduciary for the assignee of certain property interests held by LFG and LES.  The Plan expressly prohibits the post-effective-date LFG from pursuing the D&O Claims and provides that all third party actions against the former directors and officers of LFG and LES are enjoined until the LFG Trustee has concluded this litigation.[6]  The proceeds of the D&O claims will not benefit the former shareholders of LFG and LES.[7]  Rather, the D&O claims belong to and are asserted by the LFG Trustee for the sole benefit of the LFG Trust, the LES Trust, and their respective beneficiaries, including the former 1031 Exchangers and former LFG creditors.[8]

## Standing

Defendants take issue with the assignment of the D&O Claims, arguing that the LFG Trustee lacks standing to assert the LFG and LES D&O Claims against them.  The LFG Trustee acknowledges that under Virginia Law, claims for breach of fiduciary duty are not assignable.  Va. Code § 8.01-26; *FDIC v. Cocke*, 7 F.3d 396, 401-02 (4th Cir. 1993).  However, the D&O Claims, the right to pursue the D&O Claims, and the right to any proceeds realized therefrom

---

[5]  *See* Joint Chapter 11 Plan at §§ 7.3 and 7.16.

[6]  *See* Joint Chapter 11 Plan at §§ 8.3(b) and 14.4.

[7]  *See* Joint Chapter 11 Plan at §§ 5.12(a) and 8.2(b).

[8]  *See* Joint Chapter 11 Plan at §§ 8.2(b) and 8.3(b).

were transferred to the LFG Trust free and clear of all claims, liens, etc. in a taxable transaction under § 1123 of the Bankruptcy Code.[9]  Section 1123(a) of the Bankruptcy Code provides:  "(a) *notwithstanding any other applicable non-bankruptcy law*, a plan shall . . . (5) provide adequate means for the plan's implementation such as . . . (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan."  11 U.S.C. § 1123(a)(5) (emphasis added).  Plaintiff asserts that the D&O Claims were assigned to the LFG Trust notwithstanding Va. Code § 8.01-26.[10]

The Fourth Circuit has held that the scope of preemption under § 1123(a) of the Bankruptcy Code is broad enough to preempt any state law that would restrict the objectives and operation of a debtor's reorganization plan.  *Universal Cooperatives, Inc. v. FCX, Inc. (In re: FCX, Inc.)*, 853 F.2d 1149 (4th Cir. 1988).  Section 1123(a)(5) is an empowering statute.  It does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights.  *Id*. at 1155.  The prepetition D&O Claims for breach of fiduciary duty were transferred to the LFG Trustee under the terms of the Joint Chapter 11 Plan and in accordance with § 1123(a)(5)(B) of the Bankruptcy Code.  Accordingly, the LFG Trustee has standing to bring the LFG and LES D&O Claims for breach of fiduciary duty on behalf of the LFG Trust notwithstanding Virginia law that would otherwise restrict the assignability of those claims to the Trust.

The LES Defendants further complain that in advancing the D&O Claims, the LFG Trustee has employed superficial logic in bundling disparate grievances from multiple sources into a single cause of action.  The LES Defendants contend that the causes of action that were assigned to the LFG Trustee cannot be any broader than the causes of action originally held by

---

[9]  *See* Joint Chapter 11 Plan at §§ 8.2(b) and 8.9

[10]  *See* Joint Chapter 11 Plan at § 8.2(d).

LFG and LES.  In that regard, the LES Defendants argue that the LES Officers and Directors may only be sued for breach of duty by the corporation for which they served.  At issue is the Trustee's assertion of D&O Claims on behalf of LFG against the LES Defendants in Counts I and II of the Complaint.  The LES Defendants contend that the Trustee lacks standing to bring such claims as they never belonged to LFG in the first instance.[11]  The LFG Trustee counters that he is entitled to bring a direct cause of action against the LES Defendants on behalf of LFG in its capacity as the sole shareholder of LES.  Maryland law is applicable to the resolution of this issue.[12]

When a corporation refuses to pursue a claim in its own right against its officers or directors, shareholders may be permitted to sue derivatively to enforce the corporate cause of action.  *See, e.g. Shenker v. Laureate Educ.*, 983 A.2d 408, 423 (Md. 2009).  "The purpose of the derivative action is to 'place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'"  *Id.* (citation omitted).  While a derivative suit is prosecuted by shareholders, a corporation's directors and officers "are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation."  *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946).  As the LFG Trustee has asserted claims directly on behalf of LES against the LES Defendants for breach of the fiduciary duties that the officers and directors owed

---

[11]   The Defendants also argue that the Trustee may not advance claims on behalf of creditors of the corporations.  *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. Super. Ct. 2007) ("[I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors.  Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any other direct nonfiduciary claim . . . that may be available for individual creditors.").  As the Trustee has disavowed advancing any such direct claims on behalf of the creditors of LFG or LES, this challenge is not at issue.

[12]   *See* discussion *supra*.

to the corporation, no derivative action may be maintained by the shareholder of LES to enforce those same rights.

Shareholders, in certain instances, may assert a direct suit against officers and directors of a corporation. *Shenker*, 983 A.2d at 423. Non-derivative suits permit shareholders to enforce personal causes of action against a corporation's officers and directors. Courts applying Maryland law have held that shareholders may bring a direct action against a corporation's officers and directors if the shareholders suffered a direct harm that is distinct from any harm suffered by the corporation. *Strougo v. Bassini*, 282 F.3d 162, 170 (2d Cir. 2002) (applying Maryland law). *See also Giddens v. CorePartners, Inc.*, 2011 U.S. Dist. LEXIS 77408, at *13 (D. Md. July 18, 2011) ("[Plaintiff] is unable to claim a direct harm to her as a shareholder that would support a direct action against the majority shareholders and directors."). Where the harm to shareholders flows from injuries to a corporation, including injuries that decrease the value of a corporation's assets or impairs the corporation's ability to generate profits, there is no direct shareholder standing and only the corporation may bring suit. *Seidl v. Am. Century Cos.*, 427 Fed. Appx. 35, 38 (2d Cir. 2011) (applying Maryland law); *Waller*, 49 A.2d at 452 (stating that corporate malfeasance that reduces or destroys the value of a corporation's stock is not considered to cause a direct harm to shareholders and the cause of action belongs to the corporation). The alleged direct injury to a shareholder must be independent of any injury to the corporation itself. *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004).[13]

Courts applying Maryland law have also held that a shareholder may bring a direct action against a corporation's officers and directors if there is a breach of a duty owed directly to the

---

[13] While *Tooley* was decided under Delaware law, Maryland courts accord significant respect to Delaware decisions on corporate law. *See, e.g. Shenker*, 983 A.2d at 420; *Werbowsky*, 766 A.2d at 143.

shareholder. *See, e.g. Waller*, 49 A.2d at 454 (holding that a direct action could not be maintained because the "declaration does not allege the violation of any right personal to plaintiff, but only violation of rights common to all the stockholders");[14] *Schettino v. Modanlo*, 2005 Md. Cir. Ct. LEXIS 14, at *21 (Md. Cir. Ct. 2005) (holding that a shareholder had standing to bring a direct action against a director of a corporation because the director owed the shareholder a duty "separate and apart from that which [the director] owed to the company"). Such duties may be established by statute, common law, or contract. *See, e.g. Waller*, 49 A.2d at 453 (holding that a shareholder may bring a direct suit for violation of a duty "arising from contract or otherwise"); *Shenker*, 983 A.2d at 420 (holding that a shareholder may pursue a direct claim for breach of the common law duty of candor and the duty to maximize shareholder value once a decision to sell a corporation has been made).

These cases suggest that both the nature of the wrong and the nature of the relief sought are relevant to a court's inquiry into whether a shareholder has standing to bring a direct (as apposed to a derivative) suit against the officers and directors of a Maryland corporation. *See, e.g. Tooley*, 845 A.2d at 1039 ("The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."). The existence of both of these elements in a complaint should inform a court that a direct cause of action is available. A direct suit may be maintained by shareholders of a Maryland corporation against the officers and directors of a corporation where it is alleged (i) that the corporation's officers and directors breached a duty directly owed to the shareholders

---

[14]   *Waller* addressed both whether the shareholder suffered a direct harm and whether the corporation owed a personal duty to the shareholder, but was ultimately decided on the nature of the duty owed to the shareholder. *See Schettino v. Modanlo*, 2005 Md. Cir. Ct. LEXIS 14 (Md. Cir. Ct. 2005) (analyzing *Waller* and determining that the nature of the duty owed to the shareholder controls).

and (ii) that the shareholders suffered a direct harm distinct from that suffered by the corporation.

*Id.*

Here, Plaintiff alleges that the LES Defendants breached fiduciary duties that they owed directly to LFG.  The general rule in Maryland is that a corporation's officers and directors do not owe fiduciary duties directly to shareholders.  *Werbowsky v. Collomb*, 766 A.2d 123, 133 (2001) ("[D]irectors are required to perform their duties in good faith, in a manner they reasonably believe to be in the best interest of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.  That obligation runs, however, to the corporation and not, at least directly, to the shareholders."); *Wasserman v. Kay*, 14 A.3d 1193, 1207 (Md. Ct. Spec. App. 2011) ("Because directors' fiduciary duties relating to management do not extend to shareholders, a minority shareholder generally does not have a direct action for breach of those duties against the directors, except in cases affecting fundamental shareholder rights."); *Waller*, 49 A.2d at 454 ("It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders, but they are not trustees for the individual stockholders.  The reason for this distinction is that in law the corporation has a separate existence as a distinct person, in which all the corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty, but there is no legal privity or immediate connection between the directors and the individual stockholders.") (citations omitted).

This general rule does not apply, however, in the context of a wholly-owned corporation. The directors and officers of a wholly-owned corporation owe fiduciary duties both to the corporation itself and to the parent.  *See Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors

of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *Williams v. McGreevey (In re Touch Am. Holdings, Inc.)*, 401 B.R. 107, 129 (Bankr. Del. 2009) ("[T]he directors of a wholly-owned subsidiary owe fiduciary duties to both the subsidiary and to the sole shareholder, the parent corporation."); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635 (3d Cir. 2007) (holding that directors of a wholly-owned corporation could consider the interests of the parent company as well as the interests of their corporation because there was only one substantive interest to be protected).

The imposition on the officers and directors of a wholly-owned subsidiary of a fiduciary responsibility owed directly to the parent corporation is entirely appropriate as there exists only one, singular interest to be served. The wholly-owned subsidiary should act in the best interests of its parent company. A corporation with a sole shareholder should be required to tailor its decisions and actions accordingly. As LES was a wholly-owned subsidiary of LFG, the LES Defendants owed fiduciary duties directly to LFG independent of those owed to LES.

The LFG Trustee also alleges that LFG suffered significant damages directly as a result of the LES Defendants' breach of the fiduciary duties they owed to LFG. Among the damages cited are the destruction of hundreds of millions of dollars of LFG enterprise value, the unauthorized transfer of $65 million to LES in violation of corporate guidelines, the decrease in value of LFG's Underwriting Companies due to certain ARS Swaps,[15] the cost of defending litigation brought by Exchangers against LFG, the cost of responding to multiple government investigations arising out of the LES liquidity issue, and the diminution in the value of LFG

---

[15] In late October and early November of 2008, approximately $70 million of liquid securities were transferred from LFG's two principal title insurance subsidiaries to LES in exchange for approximately $88 million face value of wholly illiquid ARS in what was referred to as the "ARS Swaps." The effect of the ARS Swaps was to diminish the value of LFG's two principal title insurance subsidiaries by tens of millions of dollars. On November 24, 2008, the Nebraska Department of Insurance, the insurance regulatory agency governing LFG's two principal title insurance subsidiaries, filed a petition with the Court of Lancaster County, Nebraska, to place LFG's two principal title insurance subsidiaries in rehabilitation.

subsidiaries other than LES.   These damages represent injuries unique to LFG and are completely independent from any harm suffered by LES.

Plaintiff has met both of Maryland's alternative tests for allowing a shareholder to bring a direct cause of action against the officers and directors of a corporation.   The LFG Trustee has alleged that, as LES was a wholly-owned subsidiary of LFG, the LES Defendants owed LFG direct fiduciary duties.   The Trustee has also alleged that LFG suffered distinct harms independent from those suffered by LES.   But meeting both prongs of Maryland's alternative tests does not end the inquiry.   Plaintiff's direct right of action is further qualified by statute.   The LFG Trustee may not assert any claims against the LES Defendants on behalf of LFG for the breach of the fiduciary duties set forth in § 2-405.1 of the Corporations and Associations Article of the Maryland Code.   That section sets forth a standard of conduct required of directors of Maryland corporations.[16]   Section 2-405.1(g) provides that claims for mismanagement based upon a breach of the standard of conduct set forth in § 2-405.1 may only be asserted by the corporation or in a derivative action on behalf of the corporation.[17]

The prohibition set forth in § 2-405.1(g) is specifically limited to actions for breach of the standard of conduct set forth in that statute.   *Shenker*, 983 A.2d at 421 (stating that § 2-405.1(a) does not supersede or supplant other recognized common law duties that pre-existed the adoption of the statute in 1976).   Section 2-405.1 does not preclude direct shareholder actions for the

---

[16]  Section 2-405.1 states:

> (a) A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>> (1) In good faith;
>> (2) In a manner he reasonably believes to be in the best interests of the corporation; and
>> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

[17]  Section 2-405.1(g) of the Corporations and Associations Article of the Maryland Code provides:  "Nothing in this section creates a duty of any director of a corporation enforceable otherwise than by the corporation or in the right of the corporation."

breach of other fiduciary duties, such as the duties of candor and good faith efforts to maximize

shareholder value.  *See Id.* at 426; *Parrish v. Milk Producers Ass'n.,* 242 A2d 512, 539 (1968).

It also does not preclude direct shareholder actions for intentional misconduct.  Provided that

Maryland's test for allowing a shareholder to bring a direct cause of action against the officers

and directors of a corporation has otherwise been satisfied, a claim for breach of fiduciary duties

(other than the duty set forth in Section 2-405.1) may be asserted in a direct action by the

shareholders of a corporation.  The Liquidation Trustee may properly assert direct shareholder

actions on behalf of LFG against the LES Defendants for their breach of the fiduciary duties they

owed to LFG (other than those set forth in § 2-405.1(a)) in his capacity as assignee of the parent

of LES.

## Exculpation

### LFG Officers and Directors

The LFG Defendants argue that any liability they might have had for the demise of LFG

and LES was eliminated by LFG's corporate governing documents and Virginia law.  The

Virginia Stock Corporation Act permits the elimination of liability of directors and officers if

such a limitation is set forth in a corporation's articles of incorporation:

> In any proceeding brought by or in the right of a corporation or brought by or on
> behalf of shareholders of the corporation, the damages assessed against an officer
> or director arising out of a single transaction, occurrence or course of conduct
> shall not exceed the lesser of:
>
> > 1.  The monetary amount, *including the elimination of liability, specified
> > in the articles of incorporation* or, if approved by the shareholders, in the
> > bylaws as a limitation on or elimination of the liability of the officer or
> > director.

Va. Code Ann. § 13.1-692.1(A) (emphasis added).  Pursuant to this section, LFG properly adopted articles of incorporation that included such a provision limiting liability for its officers and directors in actions brought by or on behalf of LFG or its shareholders.[18]

Plaintiff argues that this exculpatory provision does not apply to the claims before the Court for several reasons.  First, the LFG Trustee asserts that the exculpatory provision is not available to the LFG Defendants in this case because the D&O Claims are not "brought by or in the right of a corporation or brought by or on behalf of shareholders of the corporation" as required by the statute.  The LFG Trustee argues that the D&O Claims are brought by a third party – the LFG Trustee in accordance with the Joint Chapter 11 Plan.  The LFG Trustee maintains that the D&O Claims were transferred to him from the bankruptcy estate of LFG free and clear of all encumbrances in accordance with 11 U.S.C § 1123(a)(5).  He argues that the LFG Trust is an entity separate and distinct from LFG or the shareholders of LFG.  The LFG Trustee also has the exclusive authority to bring the D&O Claims against the LFG Defendants.  Plaintiff concludes, therefore, that the D&O Claims are not being brought by or in the right of LFG.

The LFG Trustee correctly asserts that the claims that he has brought are not derivative claims of LFG.  A derivative claim as defined by the Virginia Stock Corporation Act is a "civil suit in the right of a domestic corporation."  Va. Code Ann. § 13.1-603.  The Virginia Supreme Court has further elaborated that a derivative claim is an "equitable proceeding in which a shareholder asserts, on behalf of the corporation, a claim that belongs to the corporation rather

---

[18]   Article Tenth of the LFG Articles of Incorporation states:

> To the full extent that the Virginia Stock Corporation Act, as it exists on the date hereof or may hereafter be amended, permits the limitation or elimination of the liability of directors or officers, a director or officer of the Corporation shall not be liable to the Corporation or its shareholders for any monetary damages.

than the shareholder." *Simmons v. Miller*, 261 Va. 561, 573 (2001).  As the Trustee is neither a

shareholder of LFG nor asserting the claims on the behalf of shareholders of LFG, the claims by

definition are not being brought in the right of the corporation.

Neither are the claims brought by LFG or by a successor in interest to LFG.  Rather, the

Trustee is asserting the D&O Claims of LFG that were transferred to the LFG Trustee by virtue

of the Joint Chapter 11 Plan.[19]  As the LFG Trustee now possesses the D&O Claims against

LFG's directors and officers, he can assert those claims in his own right.  The LFG Trustee

argues that Virginia Code Section 13.1-692.1(A) is inapplicable because the D&O Claims are

not being "brought by or in the right of [LFG] or brought by or on behalf of shareholders of

[LFG]."  The LFG Trustee argues that applying the Virginia exculpation statute would hinder the

purposes of the Joint Chapter 11 Plan and that the LFG defendants are precluded from invoking

the exculpation statute under principles of federal preemption.

The Court need not revisit its discussion regarding the transfer of claims or federal

preemption law to arrive at the conclusion that Plaintiff's argument here is unavailing.  The Joint

Chapter 11 Plan provides that the D&O Claims were transferred to the LFG Trustee subject to

any defenses that the LFG Defendants could have asserted directly against LFG.  Section 7.9(d)

of the Plan explicitly preserved all defenses available to the LFG directors and officers, stating

that "[n]othing herein shall preclude (i) any LFG/LES D&O from asserting setoff or any other

affirmative defenses in any litigation, including the Other Litigation, against such LFG/LES

D&O. . . ."  As the Joint Chapter 11 Plan preserved all defenses, it would be incongruous to find

that the application of the Virginia exculpation statute to the claims asserted by the LFG Trustee

would undermine the purposes of the Plan.  The LFG Defendants are not barred from asserting

the Virginia exculpation statute as an affirmative defense to the Trustee's claims.

---

[19] *See* discussion *supra.*

Plaintiff further argues that the Virginia exculpation statute does not apply to the LFG Defendants because the alleged misconduct was willful.  As set forth in part B of the Virginia exculpation statute, "the liability of an officer or director shall not be limited as provided in this section if the officer or director engaged in willful misconduct or a knowing violation of the criminal law or of any federal or state securities law."  Va. Code Ann. § 13.1-692.1(B).  Plaintiff maintains that the LFG Defendants failed to inform themselves with respect to the LES liquidity problem.  Specifically, plaintiff alleges that the directors and officers of LFG knew or should have known (i) that the ARS in LES's portfolio were inaccessible because the market for ARS was frozen, (ii) that LES nevertheless continued to solicit new Exchange Customers in order to procure new Exchange Funds so that it would be able to complete the Exchange transactions for which it was already liable, (iii) that this business strategy of LES was destined for failure unless LES could continue to generate new Exchange Funds at a rate that was at least equal to the outflow of funds required to complete Exchange Transactions for which it was already liable, (iv) that LES failed to disclose this business strategy to the new Exchange Customers that it solicited, and instead continued to use its old marketing materials touting the financial stability and solvency of LES, (v) that LES continued to comingle the new Exchange Funds it received with the holdings of other Exchange Funds in its portfolio to the detriment of the new Exchangers, and (vi) that any reasonable Exchange Customer would not have agreed to commit new Exchange Funds to LES under such circumstances especially in light of the fact that the liquid portion of the LES commingled Exchange Fund portfolio had diminished considerably and was continuing to diminish month after month.  The LFG Trustee contends that, charged with this knowledge about LES and its business practices, the conduct of the LFG Defendants' was a

knowing dereliction of duty or a conscious disregard of duty that rises to the level of willful misconduct.

The LFG Defendants urge the Court to apply a "willful and malicious" conduct standard consistent with that set forth in § 523(a)(6) of the Bankruptcy Code to the "willful misconduct" standard used in the Virginia exculpation statute.  Courts interpreting the phrase "willful and malicious" as used in § 523(a)(6) have focused on the term "injury."[20]  These courts have held that a willful act is an act intended to cause injury and not merely an intentional act that results in injury.  *See, e.g. In re Swyter*, 2002 Bankr. LEXIS 2055, at *19 (Bankr. E.D. Va. Mar. 14, 2002) (citing *Kawaauhau v. Geiger*, 523 U.S. 57 (1998)).  The LFG Defendants also cite several Virginia state court opinions that adopt a definition of willful requiring a wrongful intent.  *See, e.g. King v. Empire Collieries Co.*, 139 S.E. 478 (Va. 1927) (stating that "willful," as applied to the Virginia Workers' Compensation Statute, "imports something more than a mere exercise of the will in doing the act.  It imports a wrongful intention."); *Smith v. Litten*, 507 S.E.2d 77 (Va. 1998) ("Willful and wanton conduct is acting consciously in disregard of another person's rights or acting with a reckless indifference to the consequences to another person while aware of one's conduct and while also aware, from one's knowledge of existing circumstances and conditions, that one's conduct would probably result in injury to another.").

The Court declines to apply the "willful and malicious injury" standard of § 523(a)(6) of the Bankruptcy Code to the "willful misconduct" terminology used in the Virginia exculpation statute.  The term "willful" as used in § 523(a)(6) modifies the word "injury."  Courts have thus required that injury be the intended outcome, or at least be the substantially certain outcome, of

---

[20]  11 U.S.C 523(a)(6) states:  "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . (6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

the act in order for this standard to be met.  *See, e.g. In re Trammell*, 388 B.R. 182, 187 (Bankr. E.D. Va. 2008).  Here, however, "willful" modifies the word "misconduct."  An act constitutes "willful misconduct" if the actor commits an intentional act or omission that is wrongful, regardless whether injury was intended.  *See* Allen C. Goolsby, *Goolsby On Virginia Corporations* § 10.1 at 229 (4th ed. 2011) ("In the case of willful misconduct the perpetrator not only must have intentionally acted or failed to act, but also must have done so knowing that what he or she was doing was wrong."); *Branch v. Virginia Employment Com.*, 219 Va. 609, 612 (1978) (holding that an "employee is guilty of 'misconduct connected with his work' when he deliberately violates a company rule reasonably designed to protect the legitimate business interests of his employer, or when his acts or omissions are of such a nature or so recurrent as to manifest a willful disregard of those interests and the duties and obligations he owes his employer"); *Ogburn v. Southside Gin, Inc.*, 1997 Va. App. LEXIS 161, at *5 (Va. Ct. App. March 25, 1997) (observing that the disregard of an express order in a worker's compensation context can constitute "willful misconduct").

Plaintiff has alleged that the LFG Defendants consciously failed to act in response to the LES liquidity problem despite repeated warning signs, both internal and in the industry at large. Specifically, the Trustee alleges that allowing LES to continue its usual business practice of comingling new Exchange Funds with existing Exchange Funds and permitting LES to use new Exchange Funds to satisfy old Exchange liabilities despite (i) LES's steadily declining revenues since August 2007, (ii) the ARS freeze in February 2008, and (iii) the fact that nearly half of LES's commingled Exchange portfolio was frozen constitutes a conscious failure to respond to a critical risk facing LFG.  The Trustee also alleges that defendants Evans, Ramos, Chandler, and Gluck knowingly violated corporate guidelines when they transferred a total of $65 million from

LFG to LES without the requisite review and approval of the LFG Board of Directors.   The

Court finds that these allegations, taken as true for the purposes of this motion, rise to the level of

willful misconduct.   While the LFG Defendants may assert the Virginia Exculpation Statute as

an affirmative defense, the statute does not apply to claims alleging willful misconduct.

LES Directors and Officers

The Trustee's claims against the LES Defendants are not barred by the Maryland

exculpation statute.   Maryland statutory law authorizes a corporation to include an exculpation

provision in a corporate charter.   Section 2-405.2 of the Corporations and Associations Article of

the Maryland Code states:   "The charter of the corporation may include any provision expanding

or limiting the liability of its directors and officers to the corporation or its stockholders as

described under § 5-418 of the Courts and Judicial Proceedings Article."   Md. Code Ann., Corps.

& Ass'ns, § 2-405.2.   Section 5-418 of the Courts and Judicial Proceedings Article provides that,

subject to specifically enumerated exceptions, "[t]he charter, as defined under § 1-101 of the

Corporations and Associations Article, of a Maryland corporation may include any provision

expanding or limiting the liability of its directors and officers to the corporation or its

stockholders for money damages. . . ."   Md. Code Ann., Cts. & Jud. Proc. § 5-418.   The

exculpation provision upon which the LES Defendants rely does not appear in the corporate

charter of LES.   It is contained, instead, in its corporate by-laws.

This difference is significant.   By-laws are separate and distinct from and form no part of

the corporation's charter.   *Greenbelt Homes, Inc. v. Nyman Realty, Inc.,* 426 A.2d 394, 403 n. 4

(Md. Ct. Spec. App. 1981).   The term "charter" is defined in § 1-101 of the Maryland

Corporations and Associations Code.   This section does not include by-laws in the definition of

the charter or otherwise incorporate them into the charter documents.[21]  The Corporations and

Associations Article of the Maryland Code clearly establishes that when a corporation's charter

and by-laws are in conflict, the charter controls:  "The by-laws may contain any provision not

inconsistent with law or the charter of the corporation for the regulation and management of

affairs of the corporation."  Md. Code Ann., Corps. & Ass'ns, § 2-110(a); 8 *Fletcher Cyclopedia*

*Corporations* § 4190, at 765 (2010) ("Where by-laws conflict with the articles of incorporation,

the articles of incorporation control and the by-laws in conflict are void.").  "Furthermore, as a

general rule, when the applicable statute commands that the provision governing shareholder

rights be set out in the certificate of incorporation but the provision is not so set out, a by-law

purporting to regulate shareholder rights is void. . . .  The silence of the charter on a particular

subject may imply a limitation concerning such subject that cannot be violated by inconsistent

by-laws."  8 *Fletcher Cyclopedia Corporations* § 4190, at 765 (2010).

---

[21]  The definition states:

(f) Charter. --
  (1) "Charter" includes:
    (i) A charter granted by special act of the General Assembly;
    (ii) Articles or certificate of incorporation;
    (iii) Amended articles or certificate of incorporation;
    (iv) Articles of restatement, if approved as described in § 2-609 of this article;
    (v) Articles of amendment and restatement; and
    (vi) Articles or agreements of consolidation.

  (2) "Charter" includes the documents referred to in paragraph (1) of this subsection, either as:
    (i) Originally passed or accepted for record; or
    (ii) As amended, corrected, or supplemented by special act of the General Assembly, articles of amendment,
articles of amendment and reduction, articles of extension, articles supplementary, articles or agreements of merger,
articles of revival, or a certificate of correction.

(g) Charter document. -- "Charter document" means any:
  (1) Document enumerated in subsection (f) of this section; and

  (2) Articles of reduction, articles or agreements of transfer, articles of merger, articles of share exchange, articles
of dissolution, and stock issuance statements.

Md. Code Ann., Corps. & Ass'ns, § 1-101.

The LES Defendants argue that § 2-110(a) of the Corporations and Associations Article of the Maryland Code permits an exculpation provision to be located in a corporation's by-laws because § 2-405.2 and § 5-418 of the Corporations and Associations Article of the Maryland Code state that a corporation "may include" an exculpation provision in its charter, rather than "must include." The LES Defendants contend that § 2-405.2 and § 5-418 are permissive rather than limiting and do not foreclose a corporation's ability to place an exculpation provision in its by-laws. Therefore, the LES Defendants maintain that such an exculpation provision may be placed in the by-laws as they would not be rendered inconsistent with law or the corporation's charter.

In support of this argument, the LES Defendants cite the unpublished Fourth Circuit decision *Badlands Trust Co. v. First Fin. Fund, Inc.*, 65 F.App'x 876 (4th Cir. 2003). The court in *Badlands* held that a corporation could alter voting requirements for the election of directors in its by-laws despite § 2-104(b)(4) of the Corporations and Associations Article of the Maryland Code, a statute similar in construction to § 2-405.2, that allows corporations to include provisions in their charters raising voting requirements above those prescribed by statute.[22] *Badlands Trust Co. v. First Fin. Fund, Inc.*, 65 F.App'x 876 at *879-80.

The LES Defendants' reliance on *Badlands* is misplaced. In addition to § 2-104(b)(4) of the Corporations and Associations Article of the Maryland Code, Maryland has enacted § 2-404(d), of the Maryland Code which explicitly permits that voting requirement changes may be contained in a corporation's by-laws in addition to its charter. Md. Code Ann., Corps. & Ass'ns,

---

[22] Section 2-104(b)(4) states: "The articles of incorporation may include . . . (4) Any provision that requires for any purpose the concurrence of a greater proportion of the votes of all classes or of any class of stock than the proportion required by this article for that purpose. Md. Code Ann., Corps. & Ass'ns, § 2-104(b)(4).

§ 2-404(d).[23]   The court in *Badlands* found that the by-law provision was permissible under § 2-110 because it was explicitly authorized by statute and was not inconsistent with the corporation's charter.   Here, however, there is no such law providing that a corporation may place an exculpation provision in the by-laws of a corporation.   Quite to the contrary, there are two laws, § 2-405.2 and § 5-418, which specifically require exculpation provisions to be included in a corporation's charter.   Placing an exculpation provision in a corporation's by-laws in lieu of the corporation's charter is therefore "inconsistent with law" and § 2-110 does not apply.   The specific requirements of § 2-405.2 and § 5-418 are controlling and any exculpation provision placed in a corporation's by-laws is void.

The LES Defendants argue next that the LFG Trustee is estopped from contesting the validity of the exculpation clause.   The LES Defendants assert that both the Fourth Circuit and the Maryland Court of Appeals have held that a shareholder who accepts a corporate act does not have the right to challenge it.   *See Williams v. 5300 Columbia Pike Corp.*, 1996 WL 690064, at *4 (4th Cir. Dec. 3, 1996) (applying Delaware law) (stating that a shareholder may be estopped from challenging a transaction where the "shareholder votes for a given transaction, the corporation relies on the shareholder's expression of approval, and, subsequently, the shareholder seeks to challenge the transaction"); *Oregon Ridge Dinner Theatre, Inc. v. Hamlin*, 253 A.2d 382, 385 (Md. 1969).   The LES Defendants argue that this prohibition extends to challenges asserted by shareholders against by-laws that shareholders enacted.   *Campau v. McMath*, 463 N.W.2d 186 (Mich. Ct. App. 1990) ("Although a bylaw may be invalid, it is nonetheless binding on shareholders who themselves, voluntarily and for their own benefit and

---

[23]   Section 2-404(d) states:  "Unless the charter or bylaws of a corporation provide otherwise, a plurality of all the votes cast at a meeting at which a quorum is present is sufficient to elect a director."  Md. Code Ann., Corps. & Ass'ns, § 2-404(d).

protection, enacted it.   Since they participated in the enactment of the foregoing bylaw, defendants are now estopped from challenging its validity.").[24]   As LFG was the sole shareholder of LES, the LES Defendants maintain that the LFG Trustee is estopped, because of his status as the sole shareholder of LES, from challenging the validity of the exculpation clause contained in the by-laws of LES.[25]

Defendants bear the burden of establishing that Plaintiff is estopped from challenging the exculpation provision contained in the LES by-laws that LFG adopted as the sole shareholder of LES.   The question of estoppel raises issues of fact that must be raised and resolved as an affirmative defense.[26]   Any such affirmative defense requires factual determinations that cannot be resolved in the context of a motion to dismiss under Rule 12(b)(6).   *In re James River Coal Co.*, 360 B.R. 139, 170 n. 23 (Bankr. E.D. VA. 2007).[27]

## The Business Judgment Rule

### LFG Directors

Virginia's standard of conduct owed by corporate directors, codified in Va. Code Ann. § 13.1-690, states that "[a] director shall discharge his duties as a director, including his duties as a member of a committee, in accordance with his good faith business judgment of the best interests of the corporation."   Va. Code Ann. § 13.1-690(A).   When exercising his or her business judgment, a director is entitled to rely on information, opinions, reports, or statements

---

[24]   In Maryland, a shareholder that has "acquiesced, ratified, or participated in [a] transaction cannot bring suit thereafter" to challenge the transaction.   *Shapiro v. Greenfield*, 764 A.2d 270, 283 (Md. Ct. Spec. App. 2000) (citing *Winter v. Bernstein*, 566 N.Y.S.2d 1012, 1014 (N.Y. Sup. Ct. 1991) (stating that "[a] shareholder is estopped to challenge a corporate policy which he or she affirmatively approved")).

[25]   The Trustee has asserted direct causes of action against the LES Defendants on behalf of LFG as sole shareholder of LES.

[26]   The Trustee argues, for instance, that the issue of detrimental reliance raises questions of fact.

[27]   If Plaintiff ultimately is estopped from challenging the By-law provision, Maryland would not apply the exculpation provision to the extent that the misconduct constitutes "active and deliberate dishonesty and [is] material to the cause of action."   Md. Code Ann., Cts. & Jud. Proc. § 5-418(a)(2).

prepared or presented by other officers or employees of the corporation, legal counsel and other professionals, and committees of the board of directors of which the director is not a member, unless the director has knowledge or information concerning the matter in question that makes reliance unwarranted.  Va. Code Ann. § 13.1-690(B).

Virginia's Business Judgment Rule states that "a director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with [§ 13.1-690(A)]."  Va. Code Ann. § 13.1-690(C).  This safe harbor afforded to directors must be asserted as an affirmative defense.  *In re James River Coal Co.*, 360 B.R. 139, 170 n. 23 (Bankr. E.D. Va. 2007).  Pursuant to § 13.1-690(D), the person alleging a violation of the Business Judgment Rule bears the burden of proving the violation.

A director's compliance with § 13.1-690(A) is not measured against what a reasonable person would do in similar circumstances or by the rationality of the ultimate decision.  *Willard ex rel. Moneta Bldg. Supply, Inc. v. Moneta Bldg. Supply, Inc.*, 515 S.E.2d 277, 284 (Va. 1999). In Virginia, the relevant inquiry focuses on the subjective beliefs of the director and on the process that the director employed to arrive at a defensible business decision.  *WLR Foods, Inc. v. Tyson Foods, Inc.*, 155 F.R.D. 142, 145-146 (W.D. Va. 1994), *aff'd*, 65 F.3d 1172 (4th Cir. 1995).  The procedural soundness of a business decision may be assessed by examining (i) the qualifications of the persons with whom the director consulted, (ii) the general topics, not the substance, of the information sought or imparted, and (iii) whether the advice was followed.  *Id.*

Plaintiff alleges that the LFG Board of Directors consciously failed to take any action and consciously failed to make any decision about critical issues facing LFG despite repeated warning signs of which the LFG Board was aware.  Specifically, the Trustee alleges that as of the April 29, 2008, LFG Board of Directors Meeting, the LFG Board of Directors (i) was aware

that LES had invested in ARS; (ii) was aware of the ARS Freeze; (iii) was aware that nearly half of LES's portfolio was illiquid as a result of the ARS freeze, and, therefore, nearly half of LES's portfolio could not be used to meet its existing 1031 Exchange Obligations; (iv) was aware of, or had sufficient information to make inquiries about, the fact that LES was relying on the inflow of Exchange Funds from new 1031 Exchange transactions to finance the completion of existing 1031 Exchange transactions; (v) was aware, as reported by CFO Evans on April 29, 2008, that the real estate market was in decline, that "recession loom[ed]," and that there was "much uncertainty in the market" which made "forecasting difficult"; (vi) was aware of the 1031-related industry scandals that brought increased scrutiny on 1031 companies; and (vii) was aware of, or had sufficient information to make inquiries about, the impact that an alleged scandal at LES could have on the LandAmerica brand and on LFG.  The LFG Trustee asserts that despite this information, the LFG Board of Directors "exercised no independent judgment and failed to take or consider any timely action with respect to the LES liquidity crisis" at this meeting, as Board minutes reflect that the only decision reached was that "the [Investment Funds Committee] will continue to monitor the securities."

Plaintiff further alleges that at the July 2008 meeting of the LFG Investment Funds Committee, there was no substantive discussion of the LES liquidity problem as the discussion of the matter was postponed until the Board of Directors' scheduled October 27, 2008, meeting. The minutes of the LFG Board of Directors meeting held the following day state: "At its October 2008, meeting, the Committee will review the 1031 portfolio to gain an understanding of the timing of commitments, and management will present the Company's options if greater liquidity is needed."  Plaintiff alleges that this entry reveals that "more than five months after the LES Liquidity Crisis arose, the members of the Investment Funds Committee and the members of the

full LFG Board of Directors had yet to 'gain an understanding' of the LES Liquidity Crisis and

had still not informed themselves of options to solve or mitigate the LES Liquidity Crisis."

Plaintiff alleges that these facts evidence the LFG Board of Directors' failure to make any

decisions or take specific action regarding the LES liquidity problem.  Plaintiff alleges further

that, given these facts, the LFG Board of Directors consciously failed to make any decisions or

take any specific action regarding the legal, financial, and reputational ramifications of

continuing to allow LES to take in new 1031 Exchanger money for more than five months after

the ARS Freeze began, and of continuing to allow LES to use new Exchanger money to satisfy

old Exchange Obligations.  Alternatively, the Trustee alleges that even if this failure to take

affirmative action was the result of a conscious business decision, the LFG Board of Directors'

failure to gain an understanding of the LES liquidity problem prior making any such decision

indicates that the LFG Board of Directors failed to implement an adequate process "that would

produce a defensible business decision."  Taken as true for the purposes of this Rule 12(b)(6)

motion, these allegations are sufficient to preclude the application of Virginia's Business

Judgment Rule.  To the extent that the LFG Directors dispute these allegations, such disputes

reflect the existence of factual issues that may not be resolved in a Rule 12(b)(6) motion to

dismiss.

LES Directors

The Maryland Business Judgment Rule provides that a director who performs his or her

duties in accordance with § 2-405.1 of the Corporations and Associations Article of the

Maryland Code has no liability for violating the standard of conduct set forth therein by reason

of being or having been a director of a corporation.  Md. Code Ann., Cts. & Jud. Proc. § 5-417,

Md. Code Ann., Corps. & Ass'ns, § 2-405.1(C).  Section 2-405.1 sets forth a standard of conduct

to which corporate directors must adhere:

> (a) A director shall perform his duties as a director, including his duties as a
> member of a committee of the board on which he serves:
>> (1) In good faith;
>> (2) In a manner he reasonably believes to be in the best interests of the
>> corporation; and
>> (3) With the care that an ordinarily prudent person in a like position would
>> use under similar circumstances.
>
> (b)(1) In performing his duties, a director is entitled to rely on any information,
> opinion, report, or statement, including any financial statement or other financial
> data, prepared or presented by:
>> (i) An officer or employee of the corporation whom the director
>> reasonably believes to be reliable and competent in the matters presented;
>> (ii) A lawyer, certified public accountant, or other person, as to a matter
>> which the director reasonably believes to be within the person's
>> professional or expert competence; or
>> (iii) A committee of the board on which the director does not serve, as to a
>> matter within its designated authority, if the director reasonably believes
>> the committee to merit confidence.
>
>  (2) A director is not acting in good faith if he has any knowledge concerning
> the matter in question which would cause such reliance to be unwarranted.

Md. Code Ann., Corps. & Ass'ns, § 2-405.1(A)-(B).

Maryland courts have described the Business Judgment Rule as a "presumption that in

making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interest of the company." *Yost

v. Early*, 589 A.2d 1291, 1296-98 (Md. Ct. Spec. App. 1991).  While § 2-405.1(a)(1) focuses on

the subjective good faith of the director, §§ 2-405.1(a)(2) and (3) focus on the reasonableness of

the decision-making process, and authorize inquiry into whether a director used ordinary care to

become properly informed before making a decision.  Under § 2-405.1(a)(2), "to be reasonable, a

decision must be based on adequate information.  'Any decision undertaken on the basis of

insufficient knowledge is inherently unreasonable.'"  James J. Hanks, Jr., *Maryland Corporation*

*Law* § 6.6 at 171-72 (2010) (quoting *NCR Corp. v. Am. Tel. & Tel. Co.*, 761 F. Supp. 475, 491

(S.D. Ohio 1991) (applying Maryland law)).   Under § 2-405.1(a)(3):

> The process by which a director makes his decision will necessarily vary with the
> significance, complexity and other aspects of the decision.   As a general rule,
> directors should have available to them information material to the decision and
> should have some opportunity to ask questions of management and to meet and
> discuss the matter among themselves.

Hanks, *supra*, § 6.6 at 178.   "[T]o avail themselves of the business judgment rule, directors have

a duty to inform themselves of all material information reasonably available to them and to act

with requisite care in the discharge of their duties."   *Werbowsky v. Collomb*, 766 A.2d 123, 138-

39 (Md. 2001) (citing *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)).

The LES Defendants disagree with this application of the Business Judgment Rule.

Citing the case of *Wittman v. Crooke*, 707 A.2d 422 (Md. Ct. Spec. App. 1998), they argue that

Maryland courts have held that the Business Judgment Rule applies unless a director engages in

fraud, self-dealing, or unconscionable conduct.   In *Wittman*, the court stated that "if the corporate

directors' conduct is authorized, a showing must be made of fraud, self-dealing or

unconscionable conduct to justify judicial review."   *Wittman*, 707 A.2d at 425 (citing *Black v.*

*Fox Hills North Cmty. Ass'n., Inc.*, 599 A.2d 1228 (Md. Ct. Spec. App. 1992)).

This standard does not pertain to all applications of the Business Judgment Rule.   It

applies only where a business judgment itself is being challenged.   In *Black v. Fox Hills North*

*Community Association*, the case cited by *Wittman* for the proposition that fraud, self-dealing or

unconscionable conduct must be present to justify judicial review, the court explains that the

Business Judgment Rule "precludes judicial review of a *legitimate business decision of an*

*organization*, absent fraud or bad faith."   *Black v. Fox Hills North Cmty. Ass'n., Inc.*, 599 A.2d at

1231 (emphasis added).   This concept is also found in *Wittman* itself.   Immediately prior to the

language cited by the LES Defendants, the court stated:

> It is, of course, 'well established that courts generally will not interfere with the internal management of a corporation' and that the 'conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board *properly exercises its business judgment*, the directors are not ordinarily liable.'

*Id.* (citations omitted) (emphasis added).  The heightened standard in which a plaintiff must show fraud, self-dealing or unconscionable conduct applies only if a proper and well-informed exercise of business judgment has occurred.

Here, the LFG Trustee alleges that the LES Board of Directors never met in 2008. Taking this fact as true for the purposes of this motion, the LES Board of Directors cannot be said to have conducted a decision-making process exercised with "the care that an ordinary prudent person in a like position would use under similar circumstances" or "in a manner [it] reasonably believes to be in the best interests of the corporation."  Despite the fact that half of LES's commingled Exchange Fund portfolio was rendered illiquid as a result of the ARS Freeze, that the balance in the LES commingled Exchange Fund portfolio was declining sharply, and that LES had a backlog of impending 1031 Exchanger Obligations for which it was liable, the LES Board of Directors failed to even once convene to discuss the significant challenges facing the corporation.  Hence, no business judgment was ever exercised.  The failure to exercise any business judgment whatsoever is not protected by the Business Judgment Rule.[28]

**Breach of Fiduciary Duty Claims**

Maryland Breach of Fiduciary Duty Law

The duty owed to a Maryland corporation by its directors is set forth in § 2-405.1(a) of the Corporations and Associations Article of the Maryland Code.[29]  While § 2-405.1(a)

---

[28]  While the Court notes the Defendants' argument that the LFG Board of Directors assumed the responsibility for saving LES, there is nothing in the record that indicates that the LES Board made a conscious decision to transfer its responsibilities to the LFG Board.  Whether it did so, and to what extent, if any, is a question of fact.

[29]  *See* discussion *supra*.

specifically refers to directors, the duties enumerated in this section also serve as the standard of conduct applicable to officers of a corporation. *See Shenker v. Laureate Educ.*, 983 A.2d 408, 419 (Md. 2009) (stating that while undertaking managerial decisions "directors and officers owe the duty of care contained in § 2-405.1(a)"). Section § 2-405.1(a) does not supplant other common law fiduciary duties or serve as the sole source of duties owed to a corporation. *Shenker*, 983 A.2d at 421. Common law fiduciary duties remain in place. *Id.*

Notwithstanding the contentions of the LES Defendants to the contrary, Maryland recognizes an independent claim for breach of fiduciary duty. The LES Defendants argue that an independent claim for the breach of fiduciary duty does not exist under Maryland law based on the case of *Kann v. Kann*. There the Maryland Court of Appeals stated that "there is no omnibus tort for the breach of fiduciary duty by any and all fiduciaries." *Kann v. Kann*, 690 A.2d 509, 520-21 (Md. 1997). Maryland Courts have not entirely agreed on how to interpret this language in *Kann*. *Compare Int'l Bhd. of Teamsters v. Willis Corroon Corp. of Maryland*, 802 A.2d 1050, 1052 n.1 (Md. 2002) ("[A]lthough the breach of a fiduciary duty may give rise to one or more causes of action, in tort or in contract, Maryland does not recognize a separate tort action for breach of fiduciary duty."), *with Giddens v. CorePartners, Inc.*, 2011 U.S. Dist. LEXIS 77408, at *12 (D. Md. July 18, 2011) ("The Court does not agree with Defendants' argument that Maryland does not recognize a tort for breach of fiduciary duty.").

This Court will not apply *Kann* to preclude a claim for the breach of fiduciary duty in this case. *Kann* is distinguishable from the case at bar in that the plaintiff in *Kann* sought to create a general tort claim, including damages for "stress, mental anguish, and exacerbation of various physical ailments and conditions directly resulting from [the defendant's] actions," for any breach of fiduciary duty. *Kann*, 690 A.2d at 520. *Kann* repeatedly stresses that the type of tort

liability that the plaintiff sought to establish in that case would have permitted the award of damages even in the event that there was no economic loss to the beneficiary. *Id*. ("It is not at all clear that [the plaintiff] would limit damages for emotional distress to cases in which the trustee has caused some economic loss to the beneficiary. . . . [The plaintiff's] arguments strongly suggest that she seeks emotional distress damages if [the trustee] made any misstep, even if it did not cause loss. [The plaintiff's] quest for this new tort liability of trustees is particularly unpersuasive when one considers that there may be instances in which a trustee may commit a breach of trust mistakenly and non-negligently."). The court in *Kann* tied the legitimacy of the asserted claim for breach of fiduciary duty to an actual economic loss incurred by the beneficiary. The court sought to bar general and amorphous claims based on breaches of fiduciary duty that result in no actual harm.

This reading of *Kann* is supported by the court's immediate qualification of the language cited by the LES Defendants, in which the court explains:

> This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion. Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.

*Kann*, 690 A.2d at 521. Thus, while no general "omnibus tort for the breach of fiduciary duty" may exist, *Kann* contemplates tailored claims for a breach of fiduciary duty that are tied to discrete harms capable of being rectified by an appropriately remedy.

Here, the fiduciary relationship is established by § 2-405.1(a) as well as by common law. The LFG Trustee asserts that the LES Defendants failed to act in good faith, in a manner they reasonably believed to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances as required by

§ 2-405.1(a).  The LFG Trustee also alleges the violation of other common law fiduciary duties,

including, *inter alia*, the duties of officers and directors to remain sufficiently informed about

corporate affairs and to maximize shareholder value.   Finally, it is alleged that the LES

Defendants' breach of their fiduciary duties directly resulted in actual and quantifiable economic

losses that can be remedied by the monetary damages sought.   The Court finds that the claims

that the LFG Trustee has asserted for breach of fiduciary duty under Maryland law are

permissible claims under *Kann* and its progeny.[30]

Claims Against the LES Directors

The LFG Trustee alleges that the LES Board of Directors never met in 2008.  The LES

Board of Directors cannot be said to have conducted a decision-making process exercised with

"the care that an ordinary prudent person in a like position would use under similar

circumstances" or "in a manner [it] reasonably believes to be in the best interests of the

corporation" without holding a single Board meeting.  Although the LES Directors assert that the

responsibility for managing LES during the ARS freeze was transferred to the LFG Board of

Directors, there are insufficient facts currently in the record to support this contention.  Whether

any such abdication occurred is a factual matter that cannot be resolved by a motion to dismiss

under Rule 12(b)(6).  The LFG Trustee has properly stated a claim for the breach of fiduciary

duty against the LES Directors under Maryland law.

Claims Against the LES Officers

In Maryland, officers as well as directors are fiduciaries of a corporation and owe

fiduciary duties accordingly.  *Shenker v. Laureate Educ.*, 983 A.2d 408, 419 (Md. 2009) (stating

---

[30]  *See, e.g. Giddens*, 2011 U.S. Dist. LEXIS at *12 ("Although the Maryland Court of Appeals has made clear that
no omnibus tort so named exists, a cause of action for breach of fiduciary duty may proceed when a plaintiff
identifies the appropriate fiduciary relationship, such as principal and agent or trustee and beneficiary, identifies how
the relationship was breached, considers the available remedies, and selects the remedies appropriate to the
plaintiff's problem.)"

that the duties owed by officers of a corporation are set forth in § 2-405.1(a)). *See also Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (holding that under Delaware law the "fiduciary duties of officers are the same as those of directors"). Officers are also subject to general agency principles, including the duty to exercise reasonable care and skill in the performance of the officer's responsibilities as well as the duties of loyalty, good faith and candid disclosure. Hanks, *supra*, § 6.19 at 217. These duties include the responsibility to disclose to the agent's principal "any information that the principal may reasonably want to know." *Ins. Co. of N. Am. v. Miller*, 765 A.2d 587, 597 (Md. 2001). This includes a duty to provide a board of directors with information regarding corporate risks. Implicit in this responsibility is a requirement that officers adequately inform themselves about risks facing the company. The LFG Trustee alleges that the LES Officers failed to inform either themselves or the LES Board of Directors of significant and immediate risks facing LES.

Connor was a Senior Vice President of LES and was responsible for the day-to-day operations of LES. It is alleged that Connor knew as of April 2008 that LES was heavily invested in the frozen ARS market. It is further alleged that Connor was aware that LES's business volume had declined by almost 50% and that the declining trend was "not going to change anytime soon." Nevertheless, Connor continued to allow LES to comingle Exchange Funds. The LFG Trustee alleges that Connor did not take any action to protect LES from the impending catastrophe, including sufficiently informing the LES and LFG Boards of Directors regarding the looming crisis.

Saylors was the President of LES and was a member of the LES Board of Directors and a member of the Risk Committee. It is alleged that Saylors failed to take or to consider action to address the severe risk posed by the ARS Freeze despite being aware of the scandals and failures

in the 1031 industry and the liquidity problems that the ARS Freeze presented to LES.  It is alleged that Saylors failed to obtain even basic information regarding the financial stability of LES prior to informing LES's current and prospective customers that LES was fiscally sound.

Allen was National Underwriting Counsel to LES and was responsible for providing legal advice to the company.  It is alleged that Allen neglected to provide any legal advice as to whether it was legally permissible or advisable for LES to continue to conduct business as usual, including continuing to comingle Exchange Funds, after the ARS Freeze.

Ramos was Treasurer and a Vice-President of LES.  It is alleged that Ramos failed to adequately inform himself of the growing severity of the LES liquidity problem and subsequently failed to properly inform the LES and LFG Boards of Directors about key issues relevant to addressing the LES liquidity problem, including the continuing practice of using new Exchange Funds to pay for LES'S existing Exchange Obligations especially in light of the continuous steady decline of the balance of the commingled Exchange Fund portfolio.  It is further alleged that Ramos failed to consider timely action to address the potential reputational, financial, and legal impact of the ARS Freeze and of the continued practice of LES of conducting business as usual.

The LFG Trustee has properly stated a claim for breach of fiduciary duty by these four LES Officers under Maryland law.

Selby

Selby retired from LES in early April of 2008, less than seven weeks after the ARS Freeze began.  The Complaint says relatively little about this seven-week period.  It is alleged that prior to his retirement Selby had served as President of LES.  However, nearly all of the events and omissions that Plaintiff claims led to the demise of LFG and LES are alleged to have

44

occurred following Selby's departure.  Selby's tenure with LES ended prior to the specific

actions that the other four LES officers and directors are alleged to have failed to have taken in

response to the ARS Freeze.  The Complaint does not aver that any of these failed actions could

or should have been taken prior to Selby's departure on April 3, 2008.  Selby can only be held

accountable for losses attributable to the period prior to his departure from LES.  *Lawson v.*

*Biomedical Paint & Chem. Corp.,* 347 F. Supp. 967 (D. Md. 1972*).*  As the Complaint does not

allege what actions Selby failed to take or consider during the seven-week period he remained

with LES after the ARS Freeze or what damage occurred as a result thereof, the Complaint fails

to state a plausible cause of action for breach of fiduciary duty against Selby.

Virginia Fiduciary Duty Law

The standard of conduct for Virginia directors is set forth in § 13.1-690 of the Virginia

Stock Corporation Act, which states that "[a] director shall discharge his duties as a director,

including his duties as a member of a committee, in accordance with his good faith business

judgment of the best interests of the corporation."  Va. Code Ann. § 13.1-690(A).  As discussed

*supra*, a Virginia director's compliance with § 13.1-690(A) is not measured against the objective

standard of what a reasonable person would do in similar circumstances.  Rather, the proper

inquiry focuses on the subjective beliefs of the director and the director's use of a decision-

making process that would produce a defensible business decision.  *WLR Foods, Inc. v. Tyson*

*Foods, Inc.*, 155 F.R.D. 142, 145-146 (W.D. Va. 1994), *aff'd*, 65 F.3d 1172 (4th Cir. 1995)

("The question is not what some person external to the transaction, and looking at it with perfect

hindsight, might believe to have been an exercise of reasonably good or bad judgment based on

the substance of advice given.  Rather, good faith under the statute presents the question whether

a process was engaged that would produce a defensible business decision.").  The procedural

45

soundness of a business decision may be assessed by examining the qualifications of the persons with whom the director consulted, the general topics, not the substance, of the information sought or imparted, and whether the advice was followed. *Id.*

Corporate officers are agents who owe duties to both the corporation and its shareholders. *See WLR Foods, Inc., v. Tyson Foods, Inc.*, 869 F. Supp. 419, 421 (W.D. Va. 1994) ("A Virginia corporation's directors and officers owe a duty of loyalty both to the corporation and to the corporation's shareholders.") (citation omitted); *Upton v. S. Produce Co.*, 133 S.E. 576, 580 (Va. 1926) (stating that officers "owed the duty of frankness and fair dealing as fiduciaries to [stockholders]"); *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) (holding under Delaware law that corporate officers owe the same fiduciary duties as directors). An officer has a specific duty to "tell his principal about anything 'which might affect the principal's decision whether or how to act.'" *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 595 (Va. 1984) (citation omitted). Implicit in this duty is the requirement that an officer seek out any information that might reasonably be needed to inform a principal's decision-making process, especially regarding risks to the corporation.

The LFG Directors

Plaintiff alleges that despite being aware of the ARS freeze, the scandals and failures in the 1031 industry, and the continuing practice of LES of using new Exchange funds to pay existing Exchange Obligations, the LFG Board of Directors failed to make any conscious decision about the critical issues or to take any action to address the worsening liquidity problem. To the extent that any decisions were actually made, Plaintiff alleges that such decisions were not made following an informed decision-making process. Specifically, Plaintiff alleges that the LFG Board of Directors did not timely solicit (i) any legal opinion regarding the propriety of

46

using new Exchange Funds to meet existing Exchange Obligations in light of the frozen ARS

market or (ii) any financial analysis of LES's financial stability following the ARS Freeze.  The

LFG Trustee also alleges that the LFG Board of Directors did not seek out the advice or opinions

of LES management, as it continued to permit LES to conduct business as usual despite the

belief of LES's Senior Vice President that LES's business volume was dramatically declining,

that the "trend [was] not going to change any time soon," and that LES's prospects were "very

bleak."  Plaintiff maintains that even judged on a subjective standard, the LFG Directors failed to

employ a decision-making process sufficient to properly inform themselves and to make a

defensible decision.

The LFG Defendants argue that the LFG Trustee does not state a case for breach of

fiduciary duty, but rather alleges a general failure to monitor for corporate risks subject to the

standard set forth in *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del.

Ch. 1996).[31]  This argument is misguided.  *Caremark* concerned a general systemic failure to

implement processes and procedures to identify employee wrongdoing and illegal conduct.

*Caremark*, 698 A.2d 959.  In contrast to *Caremark*, this case involves the alleged failure of the

LFG Directors to take any action in response to specific threats to the company about which the

LFG Directors had numerous warning signs.[32]  Plaintiff is not alleging that the LFG Directors

were not aware of the ARS Freeze or of the declining value of the commingled Exchange Fund

portfolio due to a failure to implement a sufficient information-gathering apparatus; rather, the

Plaintiff alleges that the LFG Directors had or should have had knowledge of these and other

---

[31]  The court in *Caremark* established a test that plaintiffs must meet in order to show that directors breached their duty of care by failing adequately to control a corporation's employees.  Under this test, a plaintiff must demonstrate (1) that the directors knew or should have known that violations of law were occurring, (2) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (3) that such failure proximately resulted in the alleged losses.  *Caremark*, 698 A.2d at 971.

[32]  Plaintiff repeatedly refers to these warning signs throughout the Complaint as "bright red flags."

risks yet failed to act.   The *Caremark* standard is inapplicable to this case.   Plaintiff has

sufficiently stated a claim for the breach of fiduciary duty against the LFG Directors under

Virginia law.

The LFG Officers

The LFG Officers argue that the Complaint does not adequately set forth the individual

duties that they are alleged to have violated as required by *Bank of America v. Musselman*, 222

F. Supp. 2d 792 (E.D. Va. 2002).   The court in *Musselman* stated:

> [W]ith respect to officers, one court applying Delaware law has noted an
> important limitation:   'no fiduciary duty governing the management of a
> corporation's affairs can be imposed on persons who have no authority to manage
> those affairs.   In the absence of allegations that an officer has such authority under
> the certificate of incorporation, that officer has no fiduciary duty.'   (citation
> omitted).   This is a sensible limitation as some corporate officers may have little
> or no managerial authority over some or all of a company's operations.

*Musselman*, 222 F. Supp. 2d at 797 n. 10.   The LFG Officers assert that the LFG Trustee has not

pleaded sufficient information to establish that the LFG Officers had a responsibility to

investigate the impending ARS crisis and inform the LFG Board of Directors accordingly.

This argument fails for two reasons.   First, in addition to the principle cited by the LFG

Officers, *Musselman* also establishes that certain high-ranking positions, such as Chief Financial

Officer, have a commonly understood meaning and do not require the level of particularity of

pleading that would be required by a more esoteric post.   *Id.*   ("In this case, however, Hacker was

ECS's Chief Financial Officer, and as such, it appears from the face of the complaint that he

possessed the requisite degree of managerial authority with respect to the development and use

of WIP and the use of trust account funds for company operations.").   Under *Musselman*,

positions such as President, Chief Financial Officer, Treasurer, and other customary positions do

not require an explicit pleading of the position's general duties.   Second, the Complaint here

pleads significantly more detail regarding the duties of the LFG Officers than the complaint did

in *Musselman*.  The Trustee has specifically set forth the position of each of the LFG Officers

named as defendants in the Complaint, and, although all are commonly understood positions, the

LFG Trustee also describes with particularity how each Officer failed to fulfill his or her duty to

LFG.

Gluck was LFG's Chief Legal Officer and chaired the Risk Committee.  It is alleged that

Gluck failed to timely question whether LES's business practices, including the continued use of

new Exchange Funds to satisfy existing Exchange Obligations, were legally permissible

following the ARS Freeze.  As such, Gluck did not timely inform the LFG Board of Directors of

any liability that might result from permitting LES to continue to conduct business as usual in the

face of the ARS Freeze.  Special obligations of legal counsel to inform the board of directors of

risks to the corporation, such as those imposed by the Sarbanes-Oxley Act, are implicated where

the continuation of usual business practices creates exposure to legal claims and investigations.

Ramos was the Treasurer of LFG.  The duties of the LFG Treasurer were set forth in the

LFG Bylaws:

> SECTION 4.9.  Treasurer.  The Treasurer shall exercise general supervision over
> the receipt, custody and disbursement of corporate funds and shall cause such
> funds to be deposited in such banks as may be authorized by the Board of
> Directors, or in such banks as may be designated as depositaries in the manner
> provided by resolution of the Board of Directors.  The Treasurer shall have such
> further powers and duties as shall be properly assigned by the Board of Directors,
> the Chairman of the Board, the Chief Executive Officer or the President.

Bylaws of LandAmerica Financial Group (Amended and Restated October 25, 2006), Article IV,

§ 4.9.  Despite being responsible for the supervision of corporate funds, it is alleged that Ramos

failed to inform himself, and thus also the Board of Directors, that LES would run out of liquid

funds by late September 2008.  It is also alleged that Ramos failed to provide the "contingency

plan" requested by the LFG Board of Directors at its April Board meeting until October 2008. It is alleged that by then, the damage had been done. It is unclear whether Ramos ever informed the Investment Funds Committee or the full Board, as he should have, that LES's business practices, even after the ARS Freeze, entailed commingling new Exchange money and using those funds to pay out old, existing Exchanger Obligations. The LFG Trustee has alleged that, as the officer directly responsible for corporate funds, Ramos failed to adequately inform himself about the topics crucial to the LES liquidity problem and failed to consider timely action.

Evans was the Chief Financial Officer ("CFO") of LFG and a member of the Risk Committee. The duties of the LFG CFO were set forth in the LFG Bylaws:

> SECTION 4.8. Chief Financial Officer. The Chief Financial Officer shall act in an executive financial capacity and shall assist the Chief Executive Officer and the President in the general supervision of the Corporation's financial policies and affairs.

Bylaws of LandAmerica Financial Group (Amended and Restated October 25, 2006), Article IV, § 4.8. It is alleged that Evans knew that LES was using new Exchange money to pay out old, existing Exchange obligations and that he knew about the scandals and failures in the 1031 industry, but he did not inform the LFG directors. To the extent that Evans was unaware of any aspects of the ARS Freeze or 1031 industry scandals, he failed to adequately inform himself about the LES liquidity problem.

Chandler was the President, Chief Executive Officer, and Chairman of the Board of LFG. Although the duties of a corporate President and Chief Executive Officer are commonly understood, Chandler's duties were also set forth in the LFG Bylaws:

> SECTION 4.5. Chief Executive Officer. The Chief Executive Officer shall be responsible for the general management of the affairs of the Corporation and shall perform all duties incidental to his office which may be required by law and all such other duties as are properly assigned by the Board of Directors. The Chief Executive Officer shall make reports to the Board of Directors and the

> shareholders, and shall see that all orders and resolutions of the Board of Directors, and of any committee thereof, are carried into effect. The Chief Executive Officer shall, in the absence of or because of the inability to act as the Chairman of the Board, perform all of the duties of the Chairman of the Board including, in the absence of any Vice Chairman of the Board, presiding at all meetings of shareholders and of the Board of Directors.
>
> SECTION 4.6. President. The President shall act in a general executive capacity and shall assist the Chief Executive Officer in the administration and operation of the Corporation's business and general supervision of its policies and affairs. The President shall, in the absence of or because of the inability to act of the Chief Executive Officer, perform all duties of the Chief Executive Officer.

Bylaws of LandAmerica Financial Group (Amended and Restated October 25, 2006), Article IV, §§ 4.5-4.6. It is alleged that as Chief Executive Officer, Chandler either knew about and failed to disclose or did not know about and failed to inform himself that LES was using new Exchange Funds to meet existing Exchange Obligations. Chandler had a duty to make sure that an LFG subsidiary was not engaging in activities that would expose LFG to legal liability or accusations of wrongdoing. The LFG Trustee alleges that Chandler failed to timely inform himself about the topics crucial to the LES liquidity problem and that he failed to consider timely action.

Vlahcevic was the Controller of LFG and one of the three signatories of LFG's June 30, 2008, Form 10-Q. Plaintiff alleges that, as such, Vlahcevic was presumably aware of the downward trend in the balance of LES's commingled Exchange Fund portfolio. She was also presumably aware that LES was using new Exchange Funds to pay existing Exchange Obligations. Despite this knowledge, Vlahcevic failed to alert the Risk Committee, of which she was a member, or the LFG Board of Directors about the extent of the LES liquidity problem. To the extent that Vlahcevic was unaware of the downward trend in the balance of LES's commingled Exchange Fund portfolio and/or of its use of new Exchange Funds to pay for existing Exchange obligations, she failed to adequately inform herself about the LES Liquidity problem.

51

Connor was a Senior Vice President of LFG as well as a Senior Vice President of LES and was a member of the LES Board of Directors. Connor was responsible for the daily business functions of LES. It is alleged that he had knowledge of key topics relevant to the LES liquidity problems. It is alleged that Connor breached his duties as an officer of LFG by failing to inform the LFG Board of Directors regarding critical issues, including his views about LES's dire financial prospects and about the downward trend in the balance of LES'S commingled Exchange Fund portfolio, his awareness of LES's use of new commingled Exchange Funds to pay existing Exchange Obligations, and his knowledge of specific scandals and failures in the 1031 Industry. It is alleged that Connor also failed in his duty to consider timely action with respect to the LES liquidity problem.

Saylors served as a member of the LFG Risk Committee. Saylors also served as President of LES and a member of the LES Board of Directors beginning in April 2008. Plaintiff alleges that Saylors was uniquely positioned and obligated to address and inform herself about the LES Liquidity Crisis. It is alleged that Saylors failed to do so, and thus also failed to timely inform the Risk Committee and LFG Board of Directors about the risks of allowing LES to continue to conduct business as usual following the ARS Freeze. Saylors also failed to consider timely action with respect to the LES Liquidity problem.

The Trustee has sufficiently stated a claim for the breach of fiduciary duty against the LFG Officers under Virginia law.

The $65 Million Transfer

On October 25, 2006, the LFG Board of Directors unanimously approved a resolution titled "Levels of Authority" (the "Authority Guidelines"). The Authority Guidelines required prior review and consent by the LFG Board of Directors or its Executive Committee for (i) any capital or general operating expenditure exceeding $10 million; (ii) any loan exceeding $10

million; or (iii) any other material contract or obligation which is not in the ordinary course of business and which provides for a monetary commitment exceeding $10 million. Additionally, prior review and consent by the Chairman of the LFG Board of Directors, the Chief Executive Officer of LFG and the Chief Financial Officer of LFG was required for (i) any capital or general operating expenditure above $5 million but not exceeding $10 million; (ii) any loan above $5 million but not exceeding $10 million; and (iii) any other material contract or obligation which is not in the ordinary course of business and which provides for a monetary commitment above $5 million but not exceeding $10 million.

It is alleged that between September 25, 2008, and October 17, 2008, Evans and Ramos caused LFG to transfer a total of $65 million to LES so that LES could meet its Exchange Obligations. The $65 Million was transferred in the following transactions: (i) a $35 million transfer from LFG to LES, dated September 25, 2008; (ii) a $15 million transfer from LES back to LFG, dated September 30, 2008; (iii) a $10 million transfer from LFG to LES, dated October 8, 2008; (iv) a $10 million transfer from LFG to LES, dated October 14, 2008; (v) a $15 million transfer from LFG to LES, dated October 17, 2008; and (vi) a $10 million transfer from LFG to LES, dated October 17, 2008. Evans and Ramos did not obtain the prior approval of either the LFG Board of Directors or the Chairman, Chief Executive Officer, or Chief Financial Officer of LFG for any of these transfers.

During the October 1, 2008, meeting of the Investment Funds Committee of the LFG Board, the Committee was informed that LFG might transfer money to LES. On October 15, 2008, the LFG Board of Directors was notified during a Special Committee meeting that LFG had "advanced $20 million to date to the 1031 Exchange Company." The reported figure was incorrect. The actual amount of the transferred funds as of this meeting of the Special

Committee was $40 million.  On October 17, 2008, the date of the final transfer of funds, Ramos

sent an e-mail to Gluck, Evans, and Chandler informing them that as of that time he had

transferred a total of $55 million from LFG to LES to address LES's liquidity problem.  An

additional transfer of $10 million occurred later that same day.

It is alleged that Evans and Ramos breached their fiduciary duty by transferring the $65

million to LES without obtaining the requisite approval required by the Authority Guidelines.

This was not merely a "technical non-compliance" as argued by the Defendants.  The allocation

of authority to approve significant corporate expenditures is an integral part of corporate

governance.  *See O'Connor v. United States*, 956 F.2d 48, 51 (4th Cir. 1992) ("The separation of

authority within a business enterprise, and the limitation on authority held by officers is a

practical reality which is acknowledged and given effect by the courts.") (citation omitted).

It is alleged that Chandler and Gluck breached their fiduciary duty upon being informed

of the unauthorized transfers from LFG to LES on October 17, 2008.  Neither Chandler nor

Gluck consulted the Authority Guidelines or informed the full LFG Board of Directors that $65

million had been transferred in violation of corporate guidelines.  Gluck did not fulfill her

obligations as Chief Legal Officer to investigate and provide advice with respect to the violation

of the Authority Guidelines and the $65 Million Transfer.  Chandler did not fulfill his obligation

under the LFG Bylaws to ensure that LFG Board resolutions such as the Authority Guidelines

were carried into effect.  To the extent that Chandler was aware of any transfers in the amount of

$10 million before they occurred, he failed to conduct a prior review of and consent to the

transfers.  To the extent that Chandler was aware of any transfers exceeding $10 million before

they occurred, he failed to ensure that the LFG Board of Directors was notified and had an

opportunity to approve the transfers before they occurred.

It is alleged that the members of the LFG Board of Directors breached their fiduciary duty with respect to the $65 million transfer. Despite being aware of at least some of the transfers, the members of the LFG Board of Directors did nothing to inform themselves as to whether the transfers were in the best interest of LFG, to inquire whether the transfers had occurred in violation of the Authority Guidelines, or to prevent further unauthorized transfers.

The Trustee has sufficiently alleged a breach of fiduciary duty claim against Evans, Ramos, Chandler, and Gluck individually, and against the LFG Board of Directors with respect to the unauthorized transfer of $65 million from LFG to LES.

### Deepening Insolvency

The Defendants' contentions to the contrary notwithstanding, the Plaintiff's Complaint cannot be re-characterized as a claim for deepening insolvency.[33] Plaintiff alleges that the failure of the LFG and LES Officers and Directors to properly inform themselves of the risks facing LFG and LES and to take timely action to address the ARS Freeze and the ensuing LES liquidity problem caused the demise of LFG. Plaintiff alleges that the Defendants should not have allowed LES to continue to collect new Exchange Funds, to comingle those new Exchange Funds, and then to use the new Exchange Funds to pay existing Exchange obligations after the ARS Freeze. The Trustee alleges that the Defendants failed to take timely action that would have saved LFG. This is entirely different from some theory of deepening insolvency under which Plaintiff might seek to impose liability for failing to concede defeat, for failing to sell, or for failing to liquidate LFG and LES when faced with financial difficulties and potential insolvency. Defendants advance this straw man argument only to knock it down. As the allegations advanced by the LFG Trustee have nothing to do with the legal theory of deepening

---

[33]  "Deepening insolvency" refers to a theory of liability asserting that a defendant fraudulently or negligently prolonged a company's life, thereby causing the dissipation of corporate assets and exacerbating its insolvency.

insolvency, the Court need not address the Defendants' argument that claims for deepening insolvency are not recognized in Virginia.  *See Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 176 (Bankr. E.D. Va. 2007).

### Waste

The LFG Trustee alleges that Evans and Ramos wasted corporate assets by transferring the $65 million from LFG to LES.  No Virginia court has explicitly held that there exists an independent common law claim for corporate waste under Virginia law.  *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 176 (Bankr. E.D. Va. 2007).  Rather, corporate waste is considered to be a breach of fiduciary duty to the corporation.  *Id.*  ("Corporate waste as a cause of action is based on each fiduciary's duty of highest loyalty to the corporation.  Waste is therefore similar to a claim for breach of fiduciary duty.") (quoting *Pereira v. Centel Corp. (In re Argo Commc'ns Corp.)*, 134 B.R. 776 (Bankr. S.D.N.Y. 1991)).

Count V fails to state a claim against Evans and Ramos for causing the unauthorized transfer of $65 from LFG to LES for corporate waste.  Count V must, therefore, be dismissed.  The dismissal of this count is of no practical import, however, as the LFG Trustee has properly asserted a breach of fiduciary duty claim against Evans and Ramos in Count IV regarding the unauthorized transfer of the $65 million to LES.

### Damages

The LFG Trustee has pleaded cognizable damages.  "Breach of fiduciary duty is a tort, and the tortfeasor is liable for all damages proximately caused by the breach."  *In re Fairfax W. Apartment Owners Ass'n. Inc.*, 1991 U.S. App. LEXIS 9564, at *10 (4th Cir. May 14, 1991).  A complaint need not plead damages with specificity to survive a Rule 12(b)(6) motion to dismiss.  *See, e.g. Koschene v. Hutchinson*, 73 Va. Cir. 103, 106 (Va. Cir. Ct. 2007) ("While the Plaintiff

failed to go into specific detail regarding his damages, they certainly can be inferred from the

pleading. . . . [T]he Plaintiff has sufficiently stated a viable cause of action for breach of

fiduciary duty by the Defendant."); *First Am. Mktg. Corp. v. Canella*, 2004 U.S. Dist. LEXIS

2251, at *25 (E.D. Pa. Jan. 26, 2004) ("[I]t is not necessary to plead specific damages to survive

a 12(b)(6) motion. . . .  The purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency

of a complaint, not to resolve disputed facts or decide the merits of the case.").  For the purposes

of a Rule 12(b)(6) motion, it is sufficient "that the plaintiff has alleged facts that would allow it

to recover some damages on its breach of fiduciary duty claim."  *United States v. Douglas*, 626

F. Supp. 621, 623 (E.D. Va. 1985).

The Complaint contains specific allegations of damage caused by the Defendants'

actions.  Among the damages alleged are: (i) the destruction of LFG enterprise value, (ii) the

unauthorized transfer $65 million from LFG to LES, (iii) the decrease in value of LFG's

Underwriting Companies due to ARS Swaps,[34] (iv) the cost of defending litigation brought by

LES's exchange customers, (v) the cost of responding to government investigations arising out

of the LES liquidity issues, and (vi) the diminution in value of LFG subsidiaries other than LES.

The Court finds that the LFG Trustee has alleged facts that, if proven at trial, would allow the

LFG Trustee to recover at least "some damages" on his claim.  The Complaint, therefore, pleads

sufficient damages to withstand a 12(b)(6) motion to dismiss.

The Defendants challenge Plaintiff's contention that the Defendants are liable for the cost

of litigation arising out of the LES liquidity problem.  The Defendants are correct in their

assertion that the presumption in both Maryland and Virginia is that the parties bear their own

legal costs.  *See MR Crescent City, LLC v. Draper (In re Crescent City Estates, LLC)*, 588 F.3d

822, 825 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 3278 (2010); *Weichert Co. of Md., Inc. v.*

---

[34] *See* discussion *supra.*

*Faust*, 19 A.3d 393, 400 n.2 (Md. 2011); *West Square, LLC v. Commc'n Techs.*, 649 S.E.2d 798, 702 (Va. 2007).   However, the legal costs the Trustee seeks are not those resulting from this litigation.   Rather, they are the legal costs incurred as a result of numerous government investigations into the company and third party lawsuits brought by Exchangers against LFG.   A plaintiff may recover attorneys' fees arising from legal disputes with third parties caused by a defendant's tortious conduct.   *See PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 2010 U.S. Dist. LEXIS 105219, at *46 (D.S.C. Sept. 30, 2010) ("PCS may collect attorney's fees as damages to the extent that it proves its allegations that the Ross Directors' tortious conduct caused PCS to become involved in legal disputes with third parties . . . and PCS incurred attorney's fees connected with these disputes.")   The Trustee's demand for damages for expenses incurred defending third party litigation arising from the Defendants' misconduct is properly included in the Complaint.

The Defendants also challenge Plaintiff's assertion of joint and several liability against all of the Defendants.   Joint and several liability may be imposed on two categories of defendants: true joint tortfeasors, defined as those who act in concert, and concurrent tortfeasors.   *Consumer Prot. Div. v. Morgan*, 874 A.2d 919, 950 (Md. 2005); *See also Wright v. Eli Lilly & Co.*, 66 Va. Cir. 195, 212 (Va. Cir. Ct. 2004).   "[T]he predicate for concurrent tortfeasors' joint and several liability is the indivisibility of the injury. . . .   [W]hen tortfeasors act independently and their acts combine to cause a single harm, the tortfeasors are jointly and severally liable."   *Consumer Prot. Div. v. Morgan*, 874 A.2d at 950.   Joint and several liability also attaches to acts of omission if the tortfeasors act in concert or the omissions are concurrent.   *McKean v. Wal-Mart Stores, Inc.*, 2005 U.S. Dist. LEXIS 25452, at *8 (S.D. W. Va. Jul. 26, 2005).

Directors and officers of a corporation may be held jointly and severally liable if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow director or officer.  3 *Fletcher Cyclopedia Corporations* § 1002, at 666 (2010).  *See also Lawson v. Baltimore Paint & Chemical Corp.*, 347 F. Supp 967, 978 (D. Md. 1972) ("[T]he liability of fiduciaries who act together in breach of their fiduciary obligations is joint and several") (citations omitted); *Seaboard Indus., Inc. v. Monaco*, 276 A.2d 305, 309 (Pa. 1971) ("It is axiomatic that directors and officers of a corporation are jointly as well as severally liable for mismanagement, willful neglect or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director.").

Here, it is alleged that many breaches of fiduciary duty by these Defendants combined to cause the downfall of LFG.  The injury to LFG is therefore indivisible and the imposition of concurrent joint and several liability is appropriate.

## Equitable Subordination

Each of the Defendants has filed one or more proofs of claim for amounts allegedly owed to them by the LFG estate.  Proofs of claim have been filed by Defendants Gluck, Saylors, Ramos, Chandler, Evans, and Vlahcevic (collectively, the "Change of Control Defendants") in connection with the execution of certain Change of Control Employment Agreements dated October 27, 2008 (collectively, the "Change of Control Agreements").  Proofs of claim have also been filed by all the Defendants for indemnification.  The Trustee asserts that all of these claims should be equitably subordinated due to the Defendants' misconduct.  Section 510(c)(1) of the Bankruptcy Code provides that a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or

part of another allowed claim." 11 U.S.C. § 510(c)(1). To equitably subordinate a claim, "(1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re SI Restructuring, Inc.*, 532 F.3d 355, 360 (5th Cir. 2008).

As equitable subordination is an extraordinary remedy that should be applied sparingly, the party seeking equitable subordination must generally "demonstrate . . . egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching, or spoliation." *Official Comm. Of Unsecured Creditors v. Fairchild Dornier GmbH (In re Dornier Aviation (N. Am.) Inc.)*, 2005 Bankr. LEXIS 561, at *49-50 (Bankr. E.D. Va. Feb. 8, 2005) (citations omitted). Where the creditor is an insider or fiduciary, however, the standard is not as strict, and the party seeking subordination "need only show some unfair conduct, and a degree of culpability, on the part of the insider." *Id.* (citations omitted).

"Inequitable conduct for subordination purposes encompasses the breach of fiduciary duties." *Wilson v. Moir (In re Wilson)*, 359 B.R. 123, 138 (Bankr. E.D. Va. 2006). S*ee also Hovis v. Powers Constr. Co., Inc., (In re Hoffman Ass., Inc.)*, 194 B.R. 943, 965 (D.S.C. 1995) ("The inequitable conduct of the claimant under § 510(c) generally involves conduct such as . . . breach of fiduciary duty."). In addition to affirmative actions, a failure to act appropriately may constitute inequitable conduct sufficient for the purposes of equitable subordination. *See Miller v. Greenwich Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.)*, 362 B.R. 149, 164-65 (Bankr. D. Del. 2007) (holding that a "failure to service [] loan portfolios properly" constitutes inequitable conduct sufficient to warrant equitable subordination).

Here, the Court has determined *supra* that the LFG Trustee has sufficiently alleged that the Defendants breached certain fiduciary duties owed to LFG by failing to properly address the LES liquidity problem.  If proven, the breach of these duties would constitute inequitable conduct sufficient to warrant equitable subordination.  The LFG Trustee has also properly alleged that the breach of these fiduciary duties, such as the continued comingling of new Exchange Funds and the continued use of those fund to retire existing Exchange obligations despite the severe liquidity problems that LES encountered after the ARS Freeze, resulted in the demise of LFG and significant harm to the creditors of LFG.  Finally, the Court is aware of no provision within the Bankruptcy Code barring the equitable subordination of the Defendants' claims.  The LFG Trustee has properly alleged a claim for equitable subordination.

### Fraudulent Conveyance

The complaint adequately pleads a claim for the avoidance of the obligations created by the Change of Control Agreements under § 548(a)(1)(B).[35]  The LFG Trustee alleges that Gluck, Saylors, Ramos, Chandler, Evans, and Vlahcevic entered into the Change of Control Agreements

---

[35]  Section 548(a)(1)(B) states:

(a)(1)  The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
    (B)(i)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
     (ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
      (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
      (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
      (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

with LFG approximately one month prior to the Petition Date and while LFG was insolvent.  The LFG Trustee further alleges that LFG received less than a reasonably equivalent value in exchange for executing the Change of Control Agreements.

The Change of Control Defendants contest the sufficiency of this pleading on the grounds that it does not meet the "plausibility standard" articulated in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*, which requires that the complaint contain facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 545.  Specifically, the Change of Control Defendants assert that the Trustee failed to sufficiently plead facts supporting the allegation that the Debtor received less than a reasonably equivalent value in exchange for the Change of Control Agreements.  While the Complaint does not specifically set forth the value received by LFG or the industry standards for change of control agreements, such facts are not necessary to survive a motion to dismiss under Rule 12(b)(6).  The Complaint states that the Change of Control Defendants entered into the Change of Control Agreements approximately one month before the Petition Date, and that LFG did not receive a reasonably equivalent value in exchange.  The Complaint states a plausible claim on these facts.  The level of detail requested by the Change of Control Defendants involves issues of proof and exceeds that required at this stage of the proceeding.  The LFG Trustee has properly alleged a claim for the avoidance of the Change of Control Agreements under § 548 of the Bankruptcy Code.

## Conclusion

The LFG Trustee has standing pursuant to the provisions of the Joint Chapter 11 Plan confirmed in this bankruptcy case to pursue the prepetition D&O Claims of LFG and LES against their respective officers and directors.  The LFG Trustee also has standing to pursue the prepetition D&O Claims of LFG, as the sole shareholder of LES, directly (as opposed to

derivatively) against the LES Defendants, as these claims derive from fiduciary duties that the LES Defendants owed to LFG and as the resulting damage claims of LFG are separate and distinct from any harm suffered by LES.

As the provisions of the Joint Chapter 11 Plan confirmed in this bankruptcy case preserved all affirmative defenses notwithstanding the assignment of the D&O Claims to the LFG Trustee under § 1123(a)(5) of the Bankruptcy Code, the LFG Defendants may invoke the Virginia exculpation statute as an affirmative defense.  The Virginia exculpation statute, however, does not bar claims for willful misconduct.  The LFG Trustee has alleged that the LFG Defendants consciously failed to act in response to the LES liquidity problem despite repeated warning signs, both internal and in the industry at large.  If proven, the LFG Trustee's allegations would rise to the level of willful misconduct.  The LES Defendants, on the other hand, may not invoke the Maryland exculpation statute as an affirmative defense, as the exculpation provision was not included in the corporate charter of LES as required by Maryland law.  Nevertheless, the LES Defendants may be able to assert the affirmative defense of estoppel.  The LES Defendants maintain that the LFG Trustee is estopped from asserting the corporate formality that the exculpation provision had to be included in the charter and not in the by-laws.  The LES Defendants' claim of estoppel must be pleaded and proved by the LES Defendants as an affirmative defense.  But even if the LES Defendants are able to prevail in asserting this affirmative defense, the Maryland exculpation statute would not bar a claim for willful misconduct to the extent that the misconduct constitutes active and deliberate dishonesty material to the cause of action.

With the exception of Selby, the LFG Trustee has stated a claim for breach of fiduciary duty against all of the LFG Defendants and all of the LES Defendants.  Neither the Virginia

business judgment rule nor the Maryland business judgment rule serves to bar the LFG Trustee's claims as alleged as a matter of law.  Defendants are free to raise the applicability of the respective business judgment rules as affirmative defenses at trial.  The LFG Trustee's Complaint against Selby will be dismissed for failure to state a plausible claim for relief with leave to Plaintiff to amend.

The LFG Trustee has properly asserted a claim for the breach of fiduciary duty against Evans, Ramos, Chandler, Gluck and the LFG Board of Directors for LFG's unauthorized transfer of $65 million to LES in violation of the Authority Guidelines established by the LFG Board of Directors.  However, the separate cause of action asserted against Evans and Ramos for corporate waste based on the same allegations must fail.  Virginia law does not recognize an independent tort for corporate waste.  The Trustee has stated a viable claim for equitable subordination of all claims filed by the Defendants against the LFG estate.  The LFG Trustee has also properly pleaded a plausible cause of action for the avoidance of the Change of Control Agreements as fraudulent conveyances under § 548(a)(1)(B) of the Bankruptcy Code.  Finally, if the LFG Trustee is able to prevail at trial on the claims he has alleged in the Complaint, the Defendants may be held jointly and severally liable for the damages suffered by LFG.

A separate order shall issue.


ENTERED:  _____


_____/s/Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE